UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Present: The Honorable     JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF NOTICE OF REGISTRATION (Dkt. 353)**

**PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF NO. 1 INVALIDITY OF ASSERTED EAMES TRADE DRESSES (Dkt. 374)**

**PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF NO. 2 INFRINGEMENT, DILUTION AND WILLFULNESS (Dkt. 375)**

**PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF NO. 3 DAMAGES (Dkt. 376)**

**DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF FED.R.CIV.P. 50(a) (Dkt. 332)**

**DEFENDANT'S MOTION FOR PERMANENT INJUNCTION WITH RESPECT TO THE EAMES TRADE DRESS (Dkt. 379)**

**DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE BASIS OF TRADE DRESS VALIDITY, AND A NEW TRIAL ON INFRINGEMENT (Dkt. 380)**

## I.    <u>Introduction</u>

Blumenthal Distributing, Inc., d/b/a/ Office Star ("Office Star"), and Herman Miller, Inc. ("Herman Miller"), design and distribute furniture. Dkt. 13 ¶¶ 5-6; Dkt. 40 ¶ 13. In this matter, Herman Miller claimed that certain Office Star chairs ("Accused Chairs" or "Hospitality Chairs") infringed its registered and unregistered trade dress rights to two of its office chair designs -- EAMES and AERON.

On October 6, 2014, Office Star filed the First Amended Complaint ("FAC"), in which it advanced a claim

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* Dkt. 13. It sought a declaration that its "importation, advertising, depiction, offering for sale, and/or selling of any of the Accused Chairs does not infringe Herman Miller's trade dress rights." *Id.* ¶ 16. On April 24, 2015, Herman Miller filed Counterclaims against Office Star, as well as Fris Office Outfitters, Inc. ("Fris"), iFURN.com, Inc. d/b/a Officestar-Furniture-Direct.com ("iFurn") and Gamesis, Inc. d/b/a OfficeStarStore.com and d/b/a TSCShops.com ("Gamesis") (collectively, "Counterclaim Defendants"). Dkt. 40. iFurn, Fris, and Gamesis were subsequently dismissed. *See* Dkt. 228 (iFurn); Dkt. 328 (Fris, Gamesis). Herman Miller advanced the aforementioned infringement claims.

On September 22, 2016, a jury trial with respect to the counterclaims commenced. The trial proceeded for seven days. Dkts. 312, 320, 322, 325, 336, 331, 334. On October 6, 2016, the jury returned a verdict. Dkt. 344. It found that Herman Miller's trade dress to the AERON was invalid. Id. at 2. Therefore, no determination was made as to the alleged infringement by Office Star. *Id.* It also found Office Star willfully infringed Herman Miller's registered and unregistered trade dress rights in the EAMES chair in both its Thin Pad and Soft Pad models. *Id.* at 15-17. The jury awarded damages to Herman Miller. The award was for $3.3 million for infringement and $5.1 million for dilution of the value of the trade dress. *Id.* at 14, .18.

On November 4, 2016, Office Star renewed its earlier motion for a judgment as a matter of law[1] on the basis of lack of notice of one of the trademark registrations. Dkt. 353. On February 27, 2017, Office Star filed three other motions for judgment as a matter of law, on the following grounds: (i) invalidity of asserted EAMES trade dresses (Dkt. 374); (ii) failure to show infringement, dilution, and willfulness (Dkt. 375); and (iii) failure to prove damages. Dkt. 376. Herman Miller filed a consolidated opposition to these motions on March 13, 2017. Dkt. 384. Office Star replied on March 27, 2017. Dkt. 386.

On February 27, 2017, Herman Miller moved for judgment as a matter of law on the basis of failure to show invalidity of its trade dress. Dkt. 380. Herman Miller also filed a motion for a judgment and a permanent injunction with respect to infringement on the EAMES trade dress. Dkt. 379. Office Star filed a consolidated opposition on March 13, 2017. Dkt. 383. Herman Miller replied on March 27, 2017. Dkt. 387.

A hearing on the Motions was held on May 1, 2017, and they were taken under submission. For the reasons stated in this Order, Office Star's Motions for Judgment as a Matter of Law are **DENIED**. Herman Miller's Motion for Judgment as a Matter of Law is **GRANTED IN PART**. Herman Miller's Motion for Permanent Injunction is **GRANTED IN PART**.

## II.     Standard of Review

### A.     Judgment as a Matter of Law

Judgment as a matter of law is warranted where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law under Rule 50(a) must be brought before the matter is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If it is denied, it may be renewed, and "may include an alternative or joint request for a new trial under Rule 59." Fed. R.

---

[1] Such a motion is often abbreviated as "JMOL," a term that is used in this Order.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Civ. P. 50(b). "A renewed motion for judgment as a matter of law is properly granted 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

The following standards apply to a renewed motion brought pursuant to Rule 50:

> "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. While the court must review the entire evidentiary record, it must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe. If sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict.

*Id.* (citations omitted) (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227-28).

### B.    Request for a New Trial Pursuant to Fed. R. Civ. P. 59

Following a jury trial, a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Such a motion may be granted "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133,1139 (9th Cir. 1999)). However, "a district court may not grant a new trial simply because it would have arrived at a different verdict." *Id.* In assessing the clear weight of the evidence, "the judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Even if substantial evidence precludes the entry of judgment as a matter of law, a court may grant a motion for a new trial. *Id.* "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

Fed. R. Civ. P. 61 also applies to the present motions. It provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is ground for granting a new trial, [or] for setting aside a verdict . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Under these standards, in considering a motion for new trial, the first step is to determine whether an error occurred. If it is determined that there was an error, the second step is to decide whether the error caused prejudice to the party seeking a new trial.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

### III. Office Star's Motions for Judgment as a Matter of Law

#### A. Introduction

Herman Miller claims both registered and unregistered trade dress rights in the EAMES chair. Herman Miller is the owner of United States Trademark Registration No. 3,105,591 (the "'591 Registration"). Ex. 1307, Dkt. 377-15.[2] It refers to the configuration of the frame of the EAMES chair. It states: "The mark consists of the overall shape and appearance of the upper portion of a chair frame, including the armrests. The chair frame is made of polished aluminum and polished aluminum is claimed as part of the mark." *Id.* Herman Miller also asserted unregistered trade dress rights in the appearance of its Thin Pad and Soft Pad EAMES Chairs. Illustrations of the asserted registered and unregistered trade dresses are as follows:



*See* Jury Instructions, Dkt. 338 at 24 (JI 23); Ex. 1314, Dkt. 377-16. In the diagram of the registration, which appears at the far left of the images that are above, the portions of the frame that appear in solid lines are parts of the registration of the trademark, while the portions that appear in broken or dotted lines are not. *See* Dkt. 377-15. The unregistered trade dress rights encompass the overall appearance of the chairs, including the underlying frame and the upholstery. Ex. 1307, Dkt. 377-15. As shown in the illustration, there are two versions of the EAMES Chair. One has a thin pad in its upholstery, which is so labelled above; the other has a thick one, which is labelled above as a "SOFT PAD." The base of the chairs is not included in the registered or unregistered trade dress.

Office Star arranges for the manufacture and distribution of certain chairs, that are the subject of the infringement claims. Images of the Office Star chairs at issue are compiled in Exhibit 686 (pages 20-30), which was provided to the jury. The Jury was also shown representative physical examples of the

---

[2] Trial Exhibits identified in Office Star's motions for JMOL are attached to the Declaration of David A. Dillard, who is counsel for Office Star. Dkt. 377

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

accused chairs in open court during the trial. 9/29 AM Tr., Dkt. 365 at 10-12. Images of the Accused Chairs of Office Star include the following:



**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |



Excerpted from Ex. 686, Dkt. 384-20.

The jury found that Office Star willfully infringed Herman Miller's registered and unregistered trade dress rights in the EAMES chair through the Accused Chairs. As reflected in the answers to the questions on the verdict form, the jury determined that each of the EAMES trade dresses was distinctive and famous, that Office Star's Accused Chairs diluted the corresponding EAMES trade dresses, and that Office Star acted willfully in the conduct that caused the dilution. *See* Verdict, Dkt. 344 at 10-17.

Office Star advances four bases to support its motions for judgment as a matter of law. *First*, there was insufficient evidence at trial from which a reasonable jury could conclude that the EAMES trade dresses were valid. Dkt. 374. *Second*, there was insufficient evidence to support a finding that Office Star infringed on those trade dresses. Dkt. 375. *Third*, the only evidence supporting the amount of damages was speculative. Dkt. 376. *Fourth*, any award of damages must be limited to damage caused after December 13, 2013, when Office Star was first on notice of the registered trade dress. Dkt. 353.

For the reasons stated below, the Motions are **DENIED**.

### B.    Whether Office Star Waived the Right to Move for Judgment as a Matter of Law

#### 1.    Legal Standards

The court in *Nitco Holding Corp. v. Boujikian* stated that

> [i]n order to preserve a challenge to the sufficiency of the evidence to support the verdict in a civil case, a party must make two motions. First, a party must file a pre-verdict motion pursuant to Fed. R. Civ. P. 50(a). Second, a party must file a post-verdict motion for judgment as a matter of law or, alternatively, a motion for a new trial, under Rule 50(b).

491 F.3d 1086, 1089 (9th Cir. 2007) (citations omitted). The "procedural requirement of filing a Rule 50(a) motion before filing a Rule 50(b) motion" is construed "strictly," and the "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009). However, "Rule 50(b) 'may be satisfied by an

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

ambiguous or inartfully made motion' under Rule 50(a)." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)). Where a Rule 50(b) motion is brought on grounds not previously raised in a Rule 50(a) motion, the jury's verdict is reviewed for "plain error," and is reversible only "if such plain error would result in a manifest miscarriage of justice." *Id.* (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001).

2.     Application

At trial Herman Miller filed a brief in support of its Rule 50(a) motion. Dkt. 332. This motion was argued before on October 4, 2016. At that hearing, Office Star made its Rule 50 motions orally. *See* Dkt. 359 at 68-80. The Court requested a brief discussion of those motions. Office star then identified several issues as to which would seek relief under Rule 50. They included: (i) there was no infringement of the registered trade dress; (ii) the unregistered trade dress was invalid; (iii) Office Star did not have sufficient notice of the registered trade dress rights; and (iv) inadequate evidence as to damages. *Id.* at 79-80. After hearing this presentation, the Court deferred a ruling on the Rule 50 issues, and stated that no further briefing was needed at that time. *Id.* at 84.[3]

In its oral Rule 50(a) motion, Office Star did not specifically mention any issues as to the validity of the registered trade dress or infringement of the unregistered trade dress. Nor did it present any challenge to dilution damages. Herman Miller argues that Office Star's "failure to file a Rule 50(a) motion [as to these issues] precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Tortu*, 556 F.3d at 1083. However, Office Star's oral motion under Rule 50(a) stated or implied that the majority of the findings of the trial were being challenged in Office Star's pending motions for judgment as a matter of law. The Court did not require briefing of the motions having heard the oral presentation.

In light of this record, Office Star did not waive its right to seek relief under Rule 50 pursuant to the present motions.[4]

---

[3]  The Court stated:

> I am going to defer the Rule 50 motions until after the jury has deliberated. So in terms of further briefing, I think it would make -- well, I think it would make more sense to wait and see what the -- and await the jury's determination and then see what -- which motions, if any, remain to be determined, and then I can set a briefing schedule.
>
> Or -- we'll follow Rule 50. Let's just put it that way. I think that's the easier way to handle this. But on a practical level, I don't think I need more briefing right now because I will defer.

Dkt. 359 at 84.
[4]  Alternatively, Office Star proposes that its motions addressed here may be considered deferred motions for judgment as a matter of law under Rule 50(a) rather than renewed ones under Rule 50(b). Dkt 386 at 8. This could be an independent basis for their consideration in light of the ruling that the Rule 50 motions were deferred pending jury deliberations. However, it is not necessary to reach this issue in light of the determination stated above.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

**C.    Evidence Presented Regarding EAMES Chair**

1.    <u>Testimony Regarding Herman Miller Practices and Products</u>

Christopher Bingham ("Bingham"), the Director of Sales for Herman Miller, testified about the sales and marketing of the EAMES chair. 9/27 AM Tr., Dkt. 355 at 33-45. Bingham presented charts and data showing that almost 340,000 EAMES chairs were sold from 1991 to 2015. Ex. 1341, Dkt. 384-48. Bingham testified that he had investigated historic sales and marketing information, and that these figures were "consistent in prior years as far back as we could see." 355 at 40. Bingham testified that $6.6 Million is a reasonable estimate of the amount spent on the marketing of the EAMES chairs from 2004-2015. *Id.* at 42.

John Berry ("Berry"), an expert on the history of furniture, testified about the significance of the EAMES chair over time. 9/22 PM Tr., Dkt. 354 at 53-65. Berry testified that designers Charles and Ray Eames experimented with varying iterations of the chair before adopting the final design, which was distinctive and unique. *Id.* at 57, 59. Berry testified that based on the novel appearance of the EAMES chair and its significance within the design history of furniture, it has been included in the collections of many art museums, where it has been displayed. *Id.* at 62-63. Berry also testified that the EAMES chair has appeared in numerous motion pictures, television shows, and publications. 9/27 AM Tr., Dkt. 363 at 26. Based on these observations, Berry opined that the chair is famous. *Id.* On cross-examination, Office Star asked Berry whether he had performed any surveys to confirm the fame of the EAMES chair. *Id.* at 27. He testified that he had not. *Id.*

Robert Hieftje ("Hieftje"), a Senior Program Director at Herman Miller, testified that he had worked with Herman Miller for 39 years, and was involved in the marketing of the EAMES chair. *Id.* at 40-42. Hieftje testified that the EAMES chairs are very well known, and "are the icons for the definition of midcentury modern." *Id.* at 49. Hieftje also testified that certain features of the EAMES chair were particularly significant, unique to its design and a basis to distinguish it within the market. These features included: the curved side rails; the flowing trapezoidal arms; the flared spanner on the back; the scroll-like fabric at the front of the seat and the top; the one-piece web from the seat through the back with its horizontal stitching; and the narrow profile of the seat. *Id.* at 50-51. He testified that there are no utilitarian reasons for any of these elements or features to have their respective shapes or styles. Therefore, there is no utilitarian reason for the unique, overall appearance of the chair. *Id.* at 52-53.

On cross examination, Office Star asked Hieftje about the functional use of certain individual components of the EAMES chair, including the side rails, spreader bar and armrests. 9/27 AM Tr., Dkt. 355 at 10 (side rails), 11 (spreader bar), 17 (side rails), 21 (armrests). Hieftje acknowledged that each of these features has a function, but also explained that their designs contribute to "the overall look and aesthetic" of the EAMES chair. *See, e.g., id.* at 17-18.

Casey Bond ("Bond"), Herman Miller's Portfolio Lead, testified that the EAMES chair is marketed to every demographic group. *Id.* at 46-94. She testified that the majority of sales of the EAMES chair are to dealers, who primarily sell to large corporate, government and hospitality (*e.g.,* hotels) customers. *Id.* at 48-53, 97. She also testified that the EAMES chair is very popular. *Id.* at 61-77. Furthermore, she testified that typical orders of EAMES chairs are large, with the chairs used to provide seating in conference rooms and public spaces. at 52-53. She testified that the average order is for approximately 50 chairs. *Id.*

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

She also testified that EAMES chairs are more expensive than the competing and allegedly infringing Office Star chairs. She testified that the EAMES chairs are priced between $600-$1500 wholesale, and sell at an average retail price of $1200. *Id.* at 50.

Bond reviewed Herman Miller's marketing practices. She testified that Herman Miller advertises through publications, trade shows and social media. *Id.* at 62-64. She also testified that Herman Miller's advertisements focus on the aesthetic appearance and design of the EAMES chair. *Id.* at 65-68. Examples of such advertisements were admitted as exhibits and published to the jury during the trial. *See* Ex. 990, Dkt. 384-28; Ex. 679, Dkt. 384-19. Bond also presented exhibits in which media sources noted the appearance of the EAMES chair. Dkt. 355 at 68-70, 74-77; *See also, e.g.*, Ex. 650-47, Dkt. 384-14 at 48; Ex. 650-49, Dkt. 384-14 at 50; Ex. 650-171, Dkt. 384-15 at 41; Ex. 919, Dkt. 384-27; Ex. 991, Dkt. 384-29. Bond next testified that an increase in enthusiasm for mid-century modern design in recent years has led to an increase in sales of the EAMES chair. Dkt. 355 at 61-62; Ex. 1340, Dkt. 384-47 (showing spike in sales). Bond also testified that all EAMES chairs are sold with a sewn-in label on the underside of the chair, and a hangtag that features the ® symbol. Dkt. 355 at 58-59.

Bond testified that there was a reasonable possibility that consumers would be confused as to whether a given chair was a Herman Miller EAMES or an Office Star product. She testified that these types of chairs are typically purchased in significant quantities by businesses that "are buying for conference rooms or board rooms," as well as government agencies and entities, and assembled by contractors. *Id.* at 48. However, the EAMES chairs are assembled when sold. *Id.* at 57. As a result, consumers who purchase them will not see the labelled packaging in which they are delivered, but only the assembled chairs. *Id.* at 80-81.

Additionally, Bond testified that many retailers sell low-cost versions of their products under the name of a sub-brand or affiliate. Therefore, she testified that consumers could conclude that products called "Office Star" are affiliated with Herman Miller. *Id.* at 85. Bond testified that if such confusion occurred, it is unlikely that Herman Miller would be made aware of it by the Office Star customers. They would have no reason to do so. *Id.* Bond also identified one example of such confusion. A person made a comment on Office Star's Facebook page, stating "that's a nice Eames chair," in a post next to a photograph of an Office Star chair. *Id.*; *see also* Ex. 1349, Dkt. 384-50 (image of social media post). Bond testified that the likelihood of confusion was increased because Herman Miller and Office Star have an overlapping customer bases, attend the same trade shows, and advertise in some of the same industry publications. Dkt. 355 at 84-85; 88-89. Bond also testified that Office Star used certain dealers also used by Herman Miller. *Id.* at 91. Herman Miller notes that as licensed dealers, these dealers have a right to place the Herman Miller name on their doors, which could lead to additional confusion if a consumer visiting the store saw an Office Star product. Dkt. 384 at 25.

On cross examination, Office Star asked Bond whether Herman Miller had lost any competitive bids to Office Star. Dkt 355 at 99-100. Bond stated that such bidding competitions had taken place, but because they were confidential she was not aware of their outcomes. *Id.*

Robert Anders ("Anders") testified for Herman Miller as an "industrial design expert." 9/30 AM Tr., Dkt. 366 at 25-26. He testified that certain characteristics of the EAMES chair were of primary importance from a design perspective. These included its "continuous seat back and web, which has a certain kind of shape and silhouette." *Id.* at 36. Anders also testified that these key distinguishing attributes were

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

consistent across various iterations of the chair. Therefore, they all were recognizable as EAMES chairs due to these similarities. *Id.* at 46-47. Anders also testified that there are many chair designs that provide the same utility as the EAMES chair, but that their features have shapes that are different from the EAMES chair, thereby presenting different aesthetic appearances. *See* Dkt. 366 at 40-41 ("Here, you see other chairs. And the shapes are all totally different, completely different. So the shape is not dependent upon any functional utility"). Anders testified that there is no utilitarian reason for the primary features of the EAMES chair, including their shapes, armrests, upholstery patterns, and the design of the rails that hold the chair together. *Id.* at 42-47.

Anders also testified as to two utility patents, which are owned by Herman Miller, and relate to the EAMES Chair. Ex. 504, Dkt. 384-12; Ex. 505, Dkt. 384-13. One relates to a technique for mounting a web made of fabric between two rails separated by a spreader bar. Dkt. 384-12. The other relates to a method for "heat sealing" upper and lower surfaces of upholstery. Dkt. 384-13. Anders testified that this technique allowed for a wide variety of appearances in upholstery, and that the same look could be attained even without using the heat sealing technique. Dkt. 366 at 43. Anders testified that neither patent related to the overall appearance of the EAMES chair. Dkt. 366 at 39 ("Neither one of [the patents] claimed the appearances.").

Dr. Basil Englis, a survey expert, testified regarding a survey among those who were prospective purchasers of chairs. 9/30 PM Tr., Dkt. 358 at 42-44. The purpose of the survey was to measure the likelihood of confusion among such persons between an EAMES chair and the Accused Chairs. at 20-21. Survey participants were shown images of the EAMES chair and Accused Chairs, and were asked whether they believed those chairs were produced by the same or affiliated companies, and were invited to provide the basis for their views. *Id.* at 38-42. He testified that four out of five people surveyed stated that they were confused, *i.e.*, the rate of "net confusion" was 80.1%. *Id.* at 42.

2.   Testimony Regarding Office Star Practices and Products

Herman Miller called Richard Allen Blumenthal ("Blumenthal"), the founder and president of Office Star, as an adverse witness. 9/28 AM Tr., Dkt. 356 at 7. He testified that he was aware of the EAMES chairs at the time that he selected the design of the Accused Chairs. *Id.* at 13. Blumenthal acknowledged that the accused chairs had been referred to internally as "knock offs" of Herman Miller. *Id.* at 34. Other internal emails also provided evidence to support a finding that Blumenthal was aware of the similarity among the Accused Chairs and the EAMES chair at the times the Accused Chairs were being developed. *Id.* at 35-37; Ex. 775, Dkt. 384-23; Ex. 773-1, Dkt. 384-22.

Blumenthal also testified that he is aware that Office Star and Herman Miller compete directly each year as to at least five to ten bids to prospective, commercial purchasers. Dkt. 356 at 44. Other emails were also referenced whose language supported the view that Office Star was apprised of the similarity in the appearance of the Accused Chairs and the EAMES chair. *Id.* at 42-43; Ex. 1210, 380-39.

Office Star Executive Vice President Fred Rueda ("Rueda") testified that he was aware of the EAMES chair in the 1990s, prior to the introduction of the Accused Chairs. 9/29 PM Tr., Dkt. 365 at 23. A December 2010 email from an Office Star sales manager to a customer, which was also sent to Rueda, stated that the Office Star chair did not infringe on Herman Miller products. Ex. 1207, Dkt. 384. Rueda testified that this representation was not based on the opinion of legal counsel. Dkt. 365 at 35-36. Rueda

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
| --- | --- | --- | --- |
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

also testified that the accused chairs had generated large sales volumes at a very rapid and unusual pace. *Id.* 37-40. He testified that they were sold to all demographics, including sales through distributors who sell to corporate, government and retail clients. *Id.* at 13-16. This testimony was consistent with a February 2011 email, on which Rueda was copied, which advertised Office Star chairs as lower cost alternatives to the EAMES chair. *Id.* at 26-27; Ex. 775, Dkt. 384-23. Rueda testified that he was aware of five to ten instances each year in which Office Star and Herman Miller were competing through bids to the same prospective purchasers. He also testified that there may have been other similar instances of this about which he was not aware. *Id.* 45-46.

Julian Egger ("Egger"), seating designer for Office Star, testified that he was aware from his experience that the EAMES Aluminum Group chairs are famous. 9/30/16 AM Tr., Dkt. 366 at 22-23. On cross examination by Office Star, Egger clarified that he meant that it was famous to "people who like design" such as architects or others with a background in design. *Id.* at 24.

Larry Schrock ("Schrock"), Sales Manager for Office Star, testified that the Accused Chairs were intended for use in commercial offices as well as other locations. In an email, he wrote that "these chairs are 100% built for commercial offices as well. This design is excellent for corporate board rooms. This design is also popular for home offices." 9/30 PM Tr., Dkt. 358 at 76-78; Ex. 1225, Dkt. 384-33. Schrock testified that the appeal of the chairs came from their "modern classic" style. Dkt. 358 at 78-79. Certain emails from Schrock were admitted in which Schrock compared the Accused Chairs and the EAMES chair and referred to the Accused Chairs as "direct knockoffs of Herman Miller . . . chairs." *See id.* at 81-83; Ex. 1240, Dkt. 384-35.

3.    <u>Adverse Inference Instruction</u>

Prior to trial, the Court adopted a Report and Recommendation of Magistrate Judge Pym, which found that Office Star had engaged in spoliation of evidence during the discovery process. Dkt. 216. As a result, the following jury instruction was read to the jury:

> In the course of the litigation of this case, Office Star failed to preserve certain electronic records from prior to 2011, including emails with its customers and others. The loss of these records may have been due to Office Star's failure to search electronic records when it had been ordered to do so, and due to its substantial carelessness. Through this conduct, Office Star acted in a manner that reflected a disregard of its obligations and responsibilities in this case. As a result, these records were not available for inspection by Herman Miller, as is required under the governing rules in litigation. In light of this conduct by Office Star, you may presume that some of the materials that were not preserved included information that was adverse to Office Star with respect to the issues that have been presented at trial. For example, you may presume that some of them had content similar to the post-2011 communications between Office Star and third parties that mention Herman Miller or its chairs, and draw comparisons between its chairs and the Office Star chairs that are at issue in this case.

Dkt. 338 at 43 (JI 36).

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

### D. Validity of EAMES Trade Dresses

The jury was instructed that for a trade dress to be valid and protectable, it must be both non-functional, and have acquired distinctiveness through secondary meaning. Dkt. 338 at 25 (JI 24). The jury was also instructed that, as to a registered trade dress, there is a presumption that both of these requirements have been satisfied. *Id.* At trial, Office Star was limited to presenting evidence intended to rebut the presumption that the registered trade dress was not functional. The secondary meaning of the registered trade dress was not subject to challenge pursuant to 15 U.S.C. §1115(b). Office Star had the burden to prove non-functionality of the registered trade dress by the preponderance of the evidence. *Id.* As to the unregistered trade dress, Herman Miller had a burden to prove by a preponderance of the evidence that the trade dress was non-functional and had acquired secondary meaning. *Id.*

As noted, the jury found that Herman Miller had protectable trade dress rights in both its registered EAMES trade dress and its unregistered trade dress rights in the EAMES Thin Pad and Soft Pad chairs. Office Star argues that insufficient evidence was introduced at trial for a reasonable jury to reach these conclusions.

      1.    <u>Whether the Registered and Unregistered Trade Dresses Were Functional</u>

          a)    Legal Standards

In the Order denying Office Star's Motion for Summary Judgment, the standard for determining functionality was addressed:

> Functionality is a question of fact. *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 683 (9th Cir. 2012). There are two types of functionality. "[D]e facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. De jure functionality, on the other hand, means that the product is in its particular shape because it works better in this shape . . . . [B]efore an overall product configuration can be recognized as a trademark, the entire design must be arbitrary or non de jure functional." *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999) (emphasis, ellipses and alteration in original) (quoting *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 1025 (Fed. Cir. 1985)).

> "[T]rade dress protection may not be claimed for product features that are functional." *TrafFix*, 532 U.S. at 29. "[I]n general terms, a product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* at 32 (internal quotation marks omitted). Four factors are significant in assessing functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998); *see also Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006) (four factors in *Disc Golf* still legitimate considerations following *TrafFix*). Each factor should be weighed collectively, and no single factor is dispositive. *Disc Golf*, 158 F.3d at 1006.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

The fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." [*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001)] (emphasis and internal quotation marks omitted). "[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998). However, functionality may be found where "the whole is nothing other than the assemblage of functional parts" and "there is no evidence that anything about the appearance exists for any nonfunctional purpose." *Secalt*, 668 F.3d at 684.

Dkt. 192 at 17.

> b) Application

As noted, Office Star argues that Herman Miller did not present sufficient evidence to meet its burden of showing non-functionality as to its unregistered trade dress. Thus, it contends that there was not a sufficient evidentiary basis for the conclusion reached by the jury. Office Star also argues that it met its burden to rebut the presumption of non-functionality as to the registered EAMES trade dress, and that Herman Miller did present sufficient evidence in response to justify the finding by the jury. These arguments are summarized in connection with the application of the four *Disk Golf* factors.

> (1) Utilitarian Advantage

Office Star argues the overall purpose of the EAMES chairs is to provide a utilitarian advantage. Office Star refers to a utility patent owned by Herman Miller, (the "'109 patent" (Ex. 504, Dkt. 384-12)). A limited amount of evidence was presented as to the '109 Patent. The '109 patent describes the purpose of the EAMES chair in the following passage:

> This invention is particularly designed to provide furniture of dual purpose, that is, for use both indoors and outdoors. . . . For the purpose of exterior use, this furniture is specifically designed to utilize materials having maximum durability under exterior weather conditions. These conditions include the extremes of heat and dryness and cold and moisture. For the purpose of further adapting this furniture to its dual purpose, it is designed to be readily portable. It incorporates a structure of minimum weight consistent with the requirements of strength and durability imposed upon furniture particularly that designed for exterior use.

Dkt. 384-12 at 5.

Office Star also cites another patent held by Herman Miller (the "'068 patent" (Ex. 505, Dkt. 384-13)). *Id.* At trial, Hieftje viewed these patents, and testified that each appeared to describe certain utilitarian

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
| --- | --- | --- | --- |
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

advantages of the registered and unregistered trade dress.[5] "[T]he existence of an expired utility patent is weighty evidence of functionality, although that fact alone is not dispositive." *Disc Golf*, 158 F.3d at 1006.

Office Star also makes extensive arguments as to the functional elements of the EAMES chair. These were addressed at trial through the testimony of Hieftje and Berry. *See* Dkt. 363 at 28 (Berry); Dkt. 355 at 11 (Hieftje); Ex. 503, Dkt. 377-4 at 5. Specifically, Office Star presents its position as to the various functional attributes of the side rails, upper spreader, corner screws, armrests and web. These functional characteristics are related to the structural integrity, ease of assembly, safety, comfort and durability of the EAMES chair.

Other trial evidence supported the contrary position advanced by Herman Miller. It supported the position that when viewed as a whole, and on a component-by-component basis, the trade dress of the EAMES chair is not functional. This evidence included the testimony of Berry and Hieftje. As noted, each testified that the appearance of the EAMES is unique, and that this appearance was not dictated by its functionality. Anders also testified on this issue. He stated that the functions identified in the utility patents were not relevant to the overall appearance of the EAMES chair. Herman Miller also presented images of the chair, and provided testimony as to the artistic purposes that inspired its design.

Herman Miller adds that the decision of the Trademark Office to grant registration over its registered trade dress adds support for the position that the trade dress did not serve a utilitarian purpose.

Given the similarities between the registered and unregistered trade dress, and based on the evidence described in this Order, the jury could reasonably have found that the overall appearance of the EAMES chair was not functional.

(2)     Advertising

Office Star claims that Herman Miller advertising addresses the utilitarian advantages of the EAMES chair. A Herman Miller brochure about the EAMES chair includes the following statement:

> Eames Aluminum Group represents a major technical achievement by Charles and Ray Eames. They departed from the concept of chair as a solid shell and stretched a continuous piece of upholstery tautly between two aluminum side ribs. The resulting seat-back suspension provides a firm, flexible "sitting pocket" that conforms subtly to the body's shape. The one-piece curved aluminum side ribs and die-cast aluminum base make for a strong yet lightweight chair.

EAMES Brochure, Ex. 503 at 5, Dkt. 377-4.

Heiftje agreed that in referring to the technical superiority of the EAMES chair, this text was accurate "for a chair designed in 1958." Dkt. 355 at 9. This brochure supports the position that when designed, there

---

[5] Office Star states that this patent was addressed at trial by Hieftje. However, his testimony was quite limited. When presented with Ex. 504, Hieftje stated "I'm not a patent attorney, but it looks like it is a patent based on what I am reading here." Dkt. 355 at 12.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

was some consideration of functional purposes. However, Herman Miller's witnesses testified about other Herman Miller advertising. Its focus is on the aesthetic appearance of the EAMES chair. The jury was also provided with many examples of advertising for the EAMES chair that highlighted such qualities.

Based on the evidence discussed in this Order and presented at trial, there was a sufficient basis to support the finding of the jury. That there was some evidence of advertising that mentioned functionality does not change this conclusion.

(3)     Availability of Alternative Designs

As to the availability of alternative non-infringing designs, the jury was instructed as follows:

> In considering this factor, you may examine whether an alternate design could have been used, so that competition in the market for that type of product would not be hindered by allowing only one person to exclusively use the particular design or configuration. For this to be answered in the affirmative, the alternatives must be more than merely theoretical or speculative.

Dkt. 338 at 27 (JI 25).[6]

At trial, Herman Miller argued that non-infringing, alternative designs are available that retain the same functional characteristics of the EAMES chairs. Office Star argues that Herman Miller did not present any non-speculative evidence on this issue. Instead, it contends that the witnesses presented by Herman Miller only testified that such a non-infringing design was possible. The competing evidence presented by Herman Miller included the testimony of Anders. He testified that alternative designs were available for use. He also presented a table showing the variety of alternative chair designs with the EAMES identified base design, *i.e.* "a frame and upholstery with a single, slender, rectangular flexible web of roughly uniform width and thickness that has been curved into a rounded L-shape." See Dkt. 366 at 40-41.

A consideration of the trial evidence shows that it was sufficient to provide a basis for a reasonable jury to determine that alternative designs were available.

(4)     Whether Design Results from Comparatively Simple or Inexpensive Method of Manufacture

The focus of this factor is whether the design of the asserted trade dress "results from a relatively simple or inexpensive method of manufacture." Dkt. 338 at 27 (JI 25); *see also Disc Golf*, 158 F.3d at 1006. Limited trial evidence was presented as to this factor. Office Star notes that the '109 patent was presented to the jury, and that it shows that the EAMES trade dress facilitates shipping and assembly of the chairs. Dkt. 384-12. That patent also notes that the chair allows for easier replacement of certain

---

[6] Office Star objected to this instruction as an incorrect statement of law. It contends that the ability to compete is related only to "aesthetic functionality," not "utilitarian functionality," which is at issue in this case. Office Star argues that with respect to utilitarian functionality, an alternative design is one that has the same functionality but a non-infringing appearance. *See* Dkt. 330 (Office Star Objections to Trade Dress Jury Instructions). These objections were considered and rejected at the trial.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

parts. *Id.* This evidence supports the position of Office Star. However, it is not sufficient to change the result when considered in the context of all of the evidence presented on the relevant factors

\*　　　　　\*　　　　　\*

For the foregoing reasons, there was sufficient trial evidence such that a reasonable jury could find that both the registered and unregistered EAMES trade dresses were non-functional.

　　　2.　　Whether the Unregistered Trade Dress Had Secondary Meaning

　　　　　a)　　Legal Standard

As stated in the Summary Judgment Order,

> Secondary meaning is "a term of art for identification of source." *Clicks Billiards*, 251 F.3d at 1262. "The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source." *Id.* (quoting *Fuddruckers, Inc. v Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987)). Whether an asserted trade dress has acquired secondary meaning is a question of fact. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987). Where there is evidence of "deliberate copying [that] may suffice to support an inference of secondary meaning." *Fuddruckers*, 826 F.2d at 844. Other factors relevant to a finding of secondary meaning include: "(1) whether actual purchases of the product bearing the claimed trade [dress] associate the trade [dress] with the producer, (2) the degree and manner of advertising under the claimed trade [dress], (3) the length and manner of use of the claimed trade [dress] and, (4) whether use of the claimed trade [dress] has been exclusive." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985); *see also Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989).

Dkt. 192 at 23-24.

Jury instruction 26, which addressed secondary meaning, states that the jury could consider seven factors (the "*Sleekcraft* factors"[7]): (i) consumer perception; (ii) advertising; (iii) demonstrated sale success; (iv) extent of use; (v) exclusivity; (vi) copying and (vii) actual confusion. Dkt. 338 at 28-29 (JI 26).

　　　　　b)　　Application

Herman Miller presented evidence relevant to each of the factors involved in the determination of secondary meaning. This included testimony and documentary evidence as to its sales and marketing of the EAMES chair. Herman Miller also presented evidence about the EAMES chair appearing in the media, as well as its display in museums. Herman Miller also presented survey evidence that supported its position that there is a high likelihood of confusion among consumers when viewing the parties' competing products. There was also evidence that the EAMES chair is famous. Office Star's seating

---

[7] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
| --- | --- | --- | --- |
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

designer, Egger, conceded this point during his cross examination.

Herman Miller also contends that whether the registered EAMES trade dress had developed secondary meaning was not challenged by Office Star. Because the unregistered trade dress largely parallels the registered trade dress with the addition of specific upholstery, there was sufficient evidence from which the jury could reasonably have concluded that the unregistered trade dress had secondary meaning.

In light of the foregoing, Office Star has not shown a sufficient basis to challenge and vacate the jury's verdict that the unregistered EAMES trade dress had secondary meaning.

> 3.    Conclusion

For the foregoing reasons, the Office Star's Motion for judgment as a matter of law as to the validity of the EAMES trade dress is **DENIED**.

> **E.    Infringement, Dilution and Willfulness**

Office Star argues that Herman Miller did not present sufficient evidence to support a finding of infringement. Office Star also argues that Herman Miller did not present any evidence as to the fame of these trade dresses, which is a necessary element of a claim of dilution. Office Star makes a similar argument as to the finding of willfulness. For these reasons, Office Star contends that no reasonable jury could have concluded that the Accused Chairs infringed the registered or unregistered EAMES trade dress. These issues are addressed in this sequence.

> 1.    Infringement

> a)    Legal Standard for Infringement

The jury was instructed on the bases for determining whether there was infringement. The instruction on this issue was derived from Ninth Circuit Model Instruction 15.18. It set forth the *Sleekcraft* factors, which were discussed above. They are: (i) the strength of the trade dress; (ii) the similarity of the trade dresses used by the adverse parties; (iii) evidence of actual confusion; (iv) intent of the party who allegedly infringed; (v) whether the products make use of the same marketing/advertising channels; and (vi) the sophistication of and care exercised by those who purchase or select the products for use. Dkt. 338 at 31-32 (JI 28).

> b)    Application

> (1)    Strength of the Trade Dress

Office Star argues that "there was no evidence that the consuming public recognize[d] any protectable Eames trade dress as an indication of the origin of the Eames chairs." Dkt. 375-1 at 6. Office Star also contends that the EAMES trade dress includes only the frame of the chair, and no evidence was presented that it is recognized as a basis for determining the origin of the products given the absence of upholstery. It adds that no evidence was presented that the frame was ever sold or displayed in by itself.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

However, the evidence addressed above in relation to the existence of secondary meaning is also relevant here. As noted, evidence was presented on the basis of which the jury could reasonably find that secondary meaning existed as to each of the asserted EAMES trade dresses. This evidence also supports a finding that the trade dresses were distinct, and recognizable by the public as pertaining to Herman Miller.

(2)    <u>Similarity Among Trade Dresses</u>

As noted, trade dress protection extends only to non-functional items, which have acquired secondary meaning. Office Star argues that similarities in functional attributes of its chairs and the EAMES chair are irrelevant to a determination of infringement. Office Star then argues that "the ornamental aspects of the asserted Eames trade dresses and the accused Hospitality chairs are different." Dkt. 375-1 at 7. Specifically, it notes that the armrests of the EAMES chairs have shapes different from those of the Accused Chairs and that only the EAMES chairs have back spreaders with a smooth curved shape and less visible connection points.

Office Star also identifies certain dissimilarities among the specific chairs as to which infringement was found. These include that some of the Accused Chairs do not have armrests, but all of the EAMES chairs do, and some of the components of the frames of the Accused Chairs have shapes that vary from those of the registered EAMES frame. Dkt. 375-1 at 7. Based on this evidence, Office Star argues that there was no evidence of similarity between the EAMES trade dresses and those of the Accused Chairs.

The trial evidence included photographs of all of the chairs at issue. Therefore, the jury was able to compare these images, just as they had been compared during the presentation of evidence at the trial. Although there are some variations among the components of the chairs, when they are compared in a comprehensive manner that considers their entire appearances, a reasonable jury could find that the Herman Miller's registered and unregistered trade dress in the EAMES design is quite similar to the Accused Chairs.

(3)    <u>Actual Confusion</u>

The only evidence of actual confusion was a Facebook post on the Office Star website. As noted, the person who made the post stated, "this EAMES chair is nice." This statement was made about a photograph of one of the Accused Chairs. However, testimony was also presented as to why Herman Miller was not always aware of incidents of actual confusion. For example, Bond testified that the individuals who were most likely to be confused were Office Star customers who mistakenly believed that they were purchasing or using lower-cost products produced by Herman Miller.

Survey evidence was also presented by Englis as to the potential for actual confusion. Office Star argues that the testimony by Englis with respect to surveys did not support a finding of actual confusion. It contends that the results are unreliable due to the manner in which the control chairs were selected. Englis acknowledged that selection is a relevant issue. *See* Dkt. 358 at 63 (agreeing with the premise that "the greater the differences between the control chairs and the [Eames chair,] the greater the net confusion is going to be"). Office Star also contends that Englis only tested a small portion of the relevant consumer market, and that the survey was only designed to test participants "in the buying mood", rather than those who might be confused after sales were completed. *See id.* at 65. In response, Herman Miller argues that, even if the results of the survey were somewhat altered due to the choice of control group,

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

the extremely high net confusion value, which was as much as 80%, shows that the survey nonetheless established confusion.

Finally, Office Star argues that the survey conducted by Englis was flawed because it failed to distinguish between functional and non-functional features of the individual chairs. However, as noted earlier, the appropriate inquiry is whether there was infringement on the trade dress. That is an issue that requires an assessment of the overall appearance of the chairs at issue. The survey provided consumers with images of those chairs.

For the foregoing reasons, the jury could reasonably have found that there was some actual confusion.

(4)    Evidence of Intent

Office Star concedes that it was aware of the EAMES chair. However, it contends that the evidence did not support a finding that it was aware of the registration of the trade dress for the EAMES chair frame at the time the accused chairs were introduced into the market. Blumenthal testified that it received word from its manufacturer, King Hong, that the chairs were being created in a way to avoid the infringement of any patents or other intellectual property rights. *See* Dkt. 356 at 53-54. Blumenthal also testified that once Herman Miller notified Office Star of claimed infringement, he relied on the advice of its attorney, Edward Schwartz ("Schwartz") to avoid any infringement. *Id.* at 82-88. Office Star argues that its decision to engage counsel and follow its advice shows that it did not intend to infringe the EAMES trade dress.

Other evidence provides a sufficient basis for the jury to have reasonably found intent. Thus, following the introduction of the accused chairs, a retailer, OfficeMax, refused to carry the Office Star chairs due to concerns about infringement of Herman Miller's rights. Office Star responded by noting that its contract required it to indemnify OfficeMax for any liability arising from such infringement. Ex. 1207, Dkt. 384-31. Costco, also refused to sell the chairs due to concerns as to infringement of Herman Miller's rights. Ex. 1260, Dkt. 384-36. Office Star referred to the chairs internally as "knockoffs." For that reason, Office Star employees advised against featuring them on the cover of an industry publication. Ex. 1240, Dkt. 384-35.

Viewed collectively, the trial evidence provided a sufficient basis for a jury reasonably to find that the infringement was knowing and intentional.

(5)    Marketing/Advertising Channels

The jury was instructed that "[i]f Herman Miller's and Office Star's products are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion." Dkt. 338 at 31 (JI 28). Bond testified that Herman Miller primarily sells its products through independent dealers. They, in turn, resell the products to institutional buyers including companies, government contractors and other and business owners. *See* Dkt. 355 at 49. It also sells through certain retailers, including its "Design Within Reach" stores. *Id.* Bond also testified that Herman Miller's customers are often individual consumers. *Id.*

In contrast, Office Star Vice President Josh Blumenthal ("J. Blumenthal") testified that Office Star does not sell or market directly to consumers or large corporations. Dkt. 365 at 88. Instead, he testified that Office Star sells only through third party resellers, and primarily targets mid-market commercial office and

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

residential furniture vendors. *Id.* J. Blumenthal also testified that Office Star sells its chairs to larger retailers and online. *Id.* at 77-78. Office Star argues that its marketing channels are distinct from those used by Herman Miller, and do not support a finding of likelihood of confusion.

The differences in marketing channels identified by Office Star concern the use of intermediaries. The jury was instructed that "[t]he relevant consumers you should consider are all potential purchasers of office chairs in the United States." Dkt. 338 at 30 (JI 27). The trial evidence showed that both Office Star and Herman Miller sell to institutional and individual buyers in a range of settings. It also showed that the two have competed through bids to the same potential buyers.

Based on the foregoing, the trial evidence was sufficient to support a finding that the parties operated in overlapping marketing channels.

(6)    Degree of Care

The jury was instructed that "[t]he more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be." (Dkt. 338, JI 28) The EAMES chairs sell in the range of $1,200 to $2,500. (Dkt. 355 at 101:16-22 (Bond)). Other evidence showed that many customers who purchase EAMES chairs are quire careful about their purchases, and are unlikely to be misled. Bond testified that Herman Miller has "customers even on our online store saying, 'I have wanted one of these chairs for years. I have saved up for it.'" (Dkt. 355 at 76:15-21 (Bond)). On this basis, Office Star argues that customers who purchase one of its chairs are unlikely to have been confused or misled.

Herman Miller cites trial evidence that supports the notion that an individual who has not previously purchased an EAMES chair might not know their usual cost. According to Bond, such a consumer could conclude erroneously that Office Star is a low cost brand affiliated with Herman Miller. Herman Miller adds that the end users of its chairs are often not the individuals who made the purchasing decisions.

The trial evidence is sufficient to support the conclusion that a jury could reasonably have found that a significant number of consumers would be misled as to the source of the chairs they purchased.

\*                    \*                    \*

For the foregoing reasons, a reasonable jury could have found that there was infringement of Herman Miller's trade dresses.

2.    Dilution

a)    Legal Standard for Dilution

[T]o prevail on a dilution claim . . . a plaintiff must show that: (1) it owns a famous mark that is distinctive; (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark; (3) the defendant's use of its mark began after the plaintiff's mark became famous; and (4) the defendant's use of its mark is likely to cause dilution by blurring or by tarnishment.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

*Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012).

In a dilution claim, a "threshold question" is whether the trade dress in question is in fact famous. *See id.* 15 U.S.C. § 1125(c) states:

> a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> > (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> >
> > (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> >
> > (iii) The extent of actual recognition of the mark.
> >
> > (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A). Whether a mark is "famous" is a question of fact. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2007).

In determining fame, the jury was instructed to consider all relevant evidence in light of the four statutory factors stated above. Dkt. 338 at 34 (JI 30).

> b)  Application

Office Star argues that Herman Miller did not adequately establish that the EAMES trade dresses were famous at the time the accused chairs were introduced into the market. It contends that no evidence was presented that the EAMES trade dresses were widely recognized by the general consuming public . . . as a designation of source for the goods or services provided by Herman Miller. Instead, Office Star argues that Herman Miller showed only that the EAMES chair was famous within a particular niche. However, to be famous under 15 U.S.C. § 1125(c), its fame must go beyond a niche group and be recognized by the relevant portion of the general public. *See Coach Servs.,* 668 F. 3d at 1372 ("By using the 'general consuming public' as the benchmark, the [Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c)] eliminated the possibility of 'niche fame.'").

As noted above, substantial evidence was presented as to the fame of the EAMES chair. Thus, Berry testified that he believed that the EAMES was the basis for "what is known as 'mid-century modern." Dkt. 354 at 53. Bond testified that the EAMES chair was featured on certain television programs, and has many advocates and devotees on social media. Dkt. 355 at 61-63. Bond also testified that Herman Miller has been present at trade shows, some of which attract approximately 50,000 attendees. *Id.* at 62. Egger, who is Office Star's seating designer, also testified that the EAMES chair is famous among people who are interested in design. Exhibits were introduced about the use of the EAMES chair on popular television

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

programs and in films. Dkt. 354 at 62. There was also evidence about its display at several museums. *Id.* at 6.

Office Star argues that none of this evidence is persuasive. It objects that there was no evidence presented that the relevant portion of the general consuming public associates the EAMES trade dress with Herman Miller. Berry testified that he was not aware of any studies showing the demographics of EAMES customers (Dkt. 363 at 31), and that he had not done any research into the level of public recognition of the EAMES chair. *Id.* at 26. Office Star also argues that participation in trade shows, and recognition by industry personnel, is evidence about niche groups. Dkt. 364 at 17.

Office Star also contends that no evidence was presented that the Soft Pad trade dress is famous among the general consuming public. As to the registered trade dress, Office star argues that no evidence was prevented as to its fame. The fact that certain of the EAMES trade dresses were unregistered also weighs against a finding of dilution as to those trade dresses. *See Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir. 1999) (noting "the narrow reach of a dilution cause of action," and stating preference for "a limited category of trademarks, those which are truly famous and registered").

Office Star next argues that the total amount of sales of EAMES chairs does not show their fame. 337,583 units of the EAMES Aluminum Group were sold from 1991 through 2015. *See* Ex. 1330-3, Dkt. 384-45. During this same period, the sales of EAMES Soft Pad chairs totaled 70,581 and of EAMES Thin pad chairs totaled 267,002. *Id.* Office Star argues that these figures do not demonstrate fame among the consuming public. Dkt. 375-1 at 18-19 (citing *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1066 (N.D. Cal. 2015) (dismissing trademark dilution claim as "not sufficient to show that the Perfect365 Mark is famous within the meaning of 15 U.S.C. § 1125(c)(2)" despite an allegation that the product had been downloaded by over 60 million consumers globally, and over 20 million nationally)).

Office Star has presented arguments that bear on the weight of the evidence. However, they do not clearly establish that the EAMES chair was not famous, or that a reasonable jury would not reach that conclusion. As noted earlier, sufficient trial evidence was presented to support such a finding. It was not limited to sales numbers, but included information about publicity, status in popular culture, and widespread use.

Under these circumstances, it has not been shown that there was error as to this issue.

### 3.  Willfulness

As noted, Office Star argues that there is no evidence that it knew of the protectable EAMES trade dresses prior to the introduction of the Accused Chairs. It also contends that there was no evidence that Office Star made use of the names "EAMES" or "Herman Miller" in association with the sale or marketing of its chairs. Office Star also repeats the argument that the only elements that the jury could plausibly have found to have been copied were functional elements, and not protectable parts of the trade dress. Office Star also reargues that it reasonably relied on the legal advice of Schwartz. Other evidence was presented on which the jury could reasonably have found willfulness. This included the evidence discussed above as to intentional infringement by Office Star.

*          *          *

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

For the foregoing reasons, Office Star's motion for judgment as a matter of law on the existence of infringement, dilution and willfulness is **DENIED**.

### F.    Damages

The jury awarded $3.3 million in compensatory damages on the claim of infringement of the EAMES trade dress. This is the amount of profits realized by Office Star from its sale of the Accused Chairs from the time they were introduced in 2010. The jury also awarded $5.1 million to Herman Miller in compensatory damages on its claim of dilution of the EAMES trade dress. It found that both infringement and dilution were the result of intentional conduct by Office Star. *See* Verdict, Dkt. 344 at 14, 17 (checking boxes stating that infringement and dilution were willful).

Office Star argues that the damages awards should be set aside because the EAMES trade dress was not protectable. That argument was addressed and rejected above. Office Star also argues that the evidence presented in support of the amount of damages was insufficient to support the awards.

### 1.    Legal Standards for Altering or Amending Damages Award Pursuant to Fed. R. Civ. P. 59(e)

"Since specific grounds for a motion to amend or alter [an award of damages] are not listed in [Rule 59 (e)], the district court enjoys considerable discretion in granting or denying the motion." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (citation omitted). Amending a judgment is "an extraordinary remedy which should be used sparingly." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). *Allstate* provided the guidance with respect to the consideration of such a motion

> In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law.

*Id.*

A damages award by a jury may be set aside or altered if it is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006). Where the court determines that a damage award is excessive, it may either grant the motion for a new trial or a request for remittitur. If the latter relief is granted, the party to which damages were awarded then has the choice of either accepting the reduced amount, or rejecting it and proceeding with a new trial as to damages. *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1093 (N.D. Cal. 2009), aff'd, 616 F.3d 1357 (Fed. Cir. 2010) (*citing Fenner v. Dependable Trucking, Co., Inc.*, 716 F.2d 598, 603 (9th Cir.1983)). As the commentary to Rule 59 explains:

> In effect, a court offering a remittitur gives the plaintiff the choice of accepting the lower amount or facing a new trial. The court cannot order a remittitur unilaterally—it must present the options and let the plaintiff choose. A court can reduce the damages award

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

offer only to the highest amount the jury reasonably could have awarded based on the evidence presented. A party who agrees to a remittitur cannot challenge it on appeal.

Commentary to Fed. R. Civ. P. 59.

Remittitur may be granted under Fed. R. Civ. P. 59, to "the maximum amount sustainable by the evidence." *Funai*, 593 F. Supp. 2d at 1093; *see also D&S Red-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982) (courts "consistently approve remitting the judgment to the maximum amount sustainable by the proof"). In determining the maximum amount that may reasonably be sustained, courts focus on the evidence presented, and in some circumstances may consider damage awards in similar cases. *See Trainor v. HEI Hosp., LLC,* 699 F.3d 19, 33 (1st Cir. 2012).

        2.    <u>Application</u>

            a)    Whether Office Star Had Notice of Herman Miller's Trademark

As noted, Herman Miller is the owner of the '591 Registration, which refers to the frame of the EAMES chair. The Lanham Act provides:

> [A] registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.

15 U.S.C. § 1111.

Office Star argues that there is insufficient evidence as a matter of law to establish that it had actual or constructive notice of the '591 Registration prior to December 13, 2013. On this basis it argues that Herman Miller cannot recover damages for any alleged infringement on the registered trade dress that occurred prior to that time. The verdict form did not include specific findings on whether, and if so when, Office Star had notice of the '591 Registration. *See* Dkt. 344.

Herman Miller argues that there was statutory notice to Office Star because a hangtag on the EAMES chairs included the ® symbol as a superscript after the mark EAMES, *i.e.*, "EAMES®." *See* Ex. 764, Dkt. 377-10 at 2 (copy of tag). The hangtag includes a notice of copyright registration, and states in small text that "Herman Miller and EAMES are among the registered trademarks of Herman Miller, Inc." *Id.* at 5. Herman Miller argues that this provided notice of the registered trademark to the frame of the EAMES chair.

Office Star responds that the hangtag does not mention the '591 Registration, or the configuration of the chair or frame. Therefore, Office Star argues that it does not provide statutory notice of that Registration. Instead, Office Star argues that this hangtag would reasonably have been understood to state that the word "EAMES," not the trade dress, was registered. Office Star does not provide any

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

citations to legal authority in support of its argument that the registration or its contents must be identified on the labeling to provide notice.

Herman Miller's hangtag was consistent with the notice requirements of the Lanham Act. Further, as discussed above, evidence was presented at trial that could support the finding that Office Star had notice of the trademark. This included internal emails in which Office Star officials expressed concerns about potential infringement of Herman Miller's rights, and communications from Office Star customers who declined to purchase and resell the Accused Chairs due to their concerns of infringement of Herman Miller's rights. The finding that Office Star was willful in its infringement of the registered trade dress also supports the conclusion that Office Star was aware of the '591 Registration. Finally, notice could have been inferred, in part, due to the adverse inference instruction.

For the foregoing reasons, the absence of notice argument is not a basis to reduce or set aside the awards of damages.

> b) Whether the Amount of Compensatory Damages Was Supported by Sufficient Evidence

The jury was instructed that "[d]amages are the amount of money that will reasonably and fairly compensate Herman Miller for any injury that you find was caused by a defendant's alleged infringement of Herman Miller's trade dress" and that "the burden is on Herman Miller to show any damages to a reasonable certainty, and awarded damages may not be speculative." Dkt. 338 at 37 (JI 33).

Herman Miller's request for damages was based on a claim of lost sales. Therefore, it sought to recover the amount of Office Star's profits from sale of the Accused Chairs. With respect to this issue, the jury was instructed as follows:

> Herman Miller seeks this recovery on the basis that Office Star's profits may serve as an approximate measure of the sales Herman Miller would have made of its own chairs, but for the actions of Office Star. In evaluating whether or not you should conclude that Defendants' profits may be used as an approximation of Herman Miller's losses, you should consider such factors as whether Herman Miller has proven that there is actual confusion in the marketplace, whether Defendants sold their products in the same channels as Herman Miller or to the same customers, differences in the products, whether Defendants competed for sales with Herman Miller and whether the parties advertised their products to the same target customers. If you determine that Herman Miller is entitled to an award of Defendants' profits, you should determine how much of Office Star's profits you believe should be fairly allocated to Herman Miller as an approximation of Herman Miller's lost sales.

Dkt. 338 at 38 (JI 33A).

Office Star refers to Bond's testimony about lost sales. It included her statement that she was unaware of any specific instances in which Herman Miller lost a sale of an EAMES chair due to the conduct of Office Star. Dkt. 355 at 100. Office Star also repeats its argument, which was addressed and rejected above, that no evidence was presented by Herman Miller that showed confusion by buyers for large institutions,

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

including government entities and large businesses. However, even assuming that there is force to this position, substantial evidence was provided by which the jury could reasonably have found that consumers were confused by Office Star's infringing products, and that this caused a loss of sales by Herman Miller.

In light of this evidence, Office Star has not shown that it was unreasonable for the jury to find that Office Star's profits were an appropriate proxy for the amount of lost sales. *See, e.g.*, *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 838 (C.D. Cal. 2012) ("Plaintiffs do not need to prove a precise unit-for-unit comparison of sales because the proxy measure is only a 'rough' estimate of damages.").

          c)      Whether there was Sufficient Evidence to Support the Award of Dilution Damages

Office Star argues that the award of damages for dilution is unsupported by sufficient evidence, and requests that this award be vacated, or remitted. Dkt. 376-1 at 15. With respect to dilution, the jury was instructed that "[d]amages means the amount of money that will reasonably and fairly compensate Herman Miller for any dilution of its trade dress(es) that was caused by Office Star's willful conduct." Dkt. 338 at 40 (JI 33B). The jury was then instructed that, in evaluating this issue, it could to consider

    1. The injury to Herman Miller's reputation.

    2. The injury to Herman Miller's good will including its general business reputation.

    3. The consequences of such injuries to Herman Miller's sales. You may not, however, include in any award of damages for dilution, any amount of damages that you already awarded as damages for trade dress infringement.

*Id.*

Office Star argues that the jury award of $5.1 million for dilution damages, which exceeded the amount of Office Star's profits from the sale of the accused chairs, was not supported by the evidence. Testimony was presented about Herman Miller's annual expenditures for marketing the EAMES chair. These are summarized in Ex. 1331 (Dkt. 384-46).[8] Herman Miller suggests that the jury could have calculated the $5.1 million award by totaling the marketing expenses for the years of infringement, and then adding an estimate of such spending for the first nine months of 2016, to correspond to October 6, 2016, when the verdict was reached. Office Star replies that there was no showing that any or all of these expenses were incurred as part of an effort to address customer confusion or reputational harm caused by Office Star.

Herman Miller did not present direct evidence as to injury to its reputation or goodwill. There was no evidence about the need to incur the costs of either corrective advertising or other steps to address confusion among those who were active in the market for the EAMES chairs. Dkt. 376-1 at 14-15. Office

---

[8] Herman Miller's Opposition includes an excerpt of Ex. 1331, which also adds a proposed estimate of marketing expenses in 2016 that were not in the trial exhibit. Dkt. 384 at 50. Therefore, this new information is not considered in connection with the review of Exhibit 1331.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Star adds that Herman Miller's records showed a growth in sales of the EAMES chair after the introduction of the Accused Chairs. *See* Ex. 1340, Dkt. 384-47 (chart of annual sales). Office Star also argues that the amount of the award reflects that the jury improperly sought to punish Office Star, rather than compensate Herman Miller.

Herman Miller argues that the award was within the reasonable range of what a jury could find as damages. In support of this position, it cites *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012). *Skydive Arizona* adopted a standard that allowed wide latitude to a jury in determining the amount of damages caused by dilution.

*Skydive Arizona* involved a skydive center that brought claims of trademark infringement and false designation of origin against an entity called "SKYRIDE," which was an "advertising and booking service for skydiving centers." *Id.* at 1109. SKYRIDE did not own skydiving facilities in Arizona, but instead sold certificates on its website and by phone and correspondence that could be redeemed at such facilities. *Id.* Upon the redemption of one of these certificates, SKYRIDE promised to make payment to the skydiving facility that had been selected by the person who had purchased the certificate from SKYRIDE. *Id.* SKYRIDE had several websites that referred to skydiving in Arizona. *Id.* They included, "arizonaskydive.com" and "skydivingarizona.com." *Id.* The plaintiff did not advertise on any SKYRIDE website, and did not agree to accept certificates issued by SKYRIDE. *Id.* As a result, when consumers who had purchased a certificate from SKYRIDE presented it as the form of payment for Skydive Arizona, it was not accepted. *Id.* This caused consumer dissatisfaction with Skydive Arizona. Based on these facts, Skydive Arizona argued that SKYRIDE's advertising had misled customers into believing that it owned skydiving facilities, and had "sold skydiving certificates by trading upon Skydive Arizona's goodwill and misleading customers into believing that Skydive Arizona would accept SKYRIDE certificates." *Id.* Skydive Arizona also presented evidence establishing that it had a very positive and strong reputation among those in Arizona who participated in its market. *Id.* at 1112. On the basis of this evidence, SKYRIDE was found to have infringed the Skydive Arizona trademark and engaged in false advertising. At trial, damages were awarded, including for harm to the goodwill of Skydive Arizona.

On appeal, SKYRIDE challenged the award of damages for harm to goodwill because Skydive Arizona "did not provide a specific mathematical formula for the jury to use in calculating actual harm to . . . goodwill." *Id.* Absent such a formula, it argued that actual damages could not be measured. *Id.* The Ninth Circuit disagreed. It held that "[u]pon proving causation, the plaintiff's evidentiary burden relaxes considerably. To support a jury's actual damages award, there need only be substantial evidence to permit the jury to draw reasonable inferences and make a fair and reasonable assessment." *Id.* It also concluded that "section 1117 confers a wide scope of discretion upon the district judge in fashioning a remedy. Section 1117 demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages." *Id.* (internal citations and quotation marks omitted). Finally, the opinion noted that the amount of damages was not untethered from the evidence because plaintiff had provided "its advertising expenditures for a period of ten years (from 1997 to 2007), expenditures it made to build up the goodwill and reputation of its mark over a significant period of time." *Id.*

*Skydive Arizona* does not stand for the proposition that any jury award of damages as to dilution of a trademark or trade dress must be accepted if it is based on associated marketing costs. Moreover, the evidence presented in *Skydive Arizona* was more substantial than what was presented here. There, the

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

evidence included "multiple declarations and witness testimony proving that customers were very angry with, and blamed Skydive Arizona for, problems caused by SKYRIDE. This testimony came from a variety of witnesses located as far away as North Dakota, thereby demonstrating the geographic reach of the harm caused by SKYRIDE." *Id.* at 1112-13. Herman Miller did not introduce any similar evidence. There was little direct evidence about the harm caused by the dilution of its trade dresses, or damage to its reputation. For example, there was no expert testimony as to the effect of Office Star's infringement on the value of the protected trade dresses, or testimony or other evidence showing the diminution of their fame or any associated good will. Nor was evidence presented about consumers who were dissatisfied with Office Star products that they had thought were associated with Herman Miller. Nor was there survey or testimonial evidence that they faulted Herman Miller for any such deficiencies. In short, the parallels with *Skydive Arizona* are limited.

Although marketing costs are properly considered in assessing the value of a trade dress, they are neither a *per se* measure of dilution caused by infringement nor a proxy for that amount. In this regard, it is significant that the amount awarded by the jury in dilution damages was the same as the amount that Herman Miller claimed to have spent on marketing the chairs at issue over the period of the infringement.

Although the evidence presented by Herman Miller as to its claim for dilution damages supports a financial remedy, it was not sufficient to justify the $5.1 million award. It is substantially greater than the amount of Herman Miller's lost sales revenues that were found to have resulted from Office Star's infringement. Having carefully considered the totality of the evidence presented at trial, including consumer confusion, marketing costs, the fame of the EAMES chair trade dress, an appropriate award of dilution damages is $3 million. Therefore, the present award of $5.1 million is remitted by $2.1 million. Herman Miller may elect to accept this amount, or seek a new trial as to damages.

*　　　　*　　　　*

For the foregoing reasons, Office Star's Motion for Judgment as a Matter of Law on the Basis of Damages is **GRANTED IN PART**, *i.e.,* as to the amount of dilution damages.

## IV.    Herman Miller's Motion for JMOL on Validity and for New Trial on Infringement (Dkt. 380)

### A.    Introduction

Herman Miller claims both registered and unregistered trade dress rights in the AERON chair. As to registered trade dress, Herman Miller holds United States Trademark Registration No. 2,754,826. Ex. 1306, Dkt. 380-42 (AERON Registration). Herman Miller also asserts unregistered trade dress rights in the overall appearance of the AERON chair. There are two versions, which vary in the form of their lumbar support. Images of versions of the AERON chair, which Herman Miller asserted reflected the unregistered trade dress rights, were provided to the jury. *See* Ex. 1314, Dkt. 380-43. Examples of the asserted registered and unregistered trade dresses are as follows:

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |







**Trademark Office REGISTRATION**  **AERON with Adjustable Lumbar**  **AERON with PostureFit Lumbar**

Dkt. 380 at 9.

The jury found that the AERON registered and unregistered trade dresses were as to functional features, and lacked secondary meaning. *See* Dkt. 344. On these bases, the jury found that the trade dress for the AERON chairs was invalid, and that it was unnecessary to determine whether any infringement had occurred.

Herman Miller has filed a motion seeking judgment as a matter of law on the basis of trade dress validity, and a new trial on infringement. Dkt. 380. Herman Miller argues that, in light of the evidence presented a trial, a reasonable jury could not have found the absence of secondary meaning. As to functionality, Herman Miller contends that the jury instruction on this issue was in error because it set an incorrect standard for determining functionality. Herman Miller also argues that, in light of the evidence presented a trial, a reasonable jury could not have found that the AERON trade dress was invalid. Herman Miller argues that the evidence presented by Office Star concerned only the functionality of the component parts of the AERON. The correct standard for this issue required that the AERON be viewed as a whole. In contrast, Herman Miller argues that it presented substantial evidence showing that the overall appearance of the AERON was non-functional.

**B.    Evidence Presented Regarding AERON Chair**

1.    <u>Testimony Regarding Herman Miller Practices and Products</u>

The jury was presented with the AERON trade dress registration from the U.S. Trademark Office (Ex. 1306, Dkt. 380-42) and the file history for Herman Miller's application to the Trademark Office. Ex. 652, Dkt. 380-18, 380-19, 380-20. The file history shows that the Trademark Office initially found the AERON application deficient due to a lack of showing of secondary meaning and functionality. *See* Ex 652 at 8-30. In response to this position, Herman Miller submitted evidence to the Trademark Office, including

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

hundreds of affidavits from those working within the furniture industry (Ex. 652 at 291-558), sales and marketing statistics (*id.* at 11-21) and advertising and awards (*id.* at 31-40 and referenced exhibits). On the basis of these supplemental materials, the Trademark Office granted the registration. The jury was informed that the grant of registration from the Trademark Office meant that the Registered Trade Dress was immune from attack as to lack of secondary meaning, and that Office Star had the burden to prove that the AERON design was functional.

Patrick Hogan ("Hogan") who is Herman Miller's Director of Global Finance, testified as to the expenditure of funds on the sales and marketing of the AERON chair. 9/28 AM Tr., Dkt. 364 at 11-20. Charts were also presented in support of this testimony. *See* Ex. 1330, Dkt. 380-44; Ex. 1331, Dkt. 380-45; Ex. 1338, Dkt. 380-48; Ex. 1339, Dkt. 380-49. This evidence showed that 6.5 million units of the AERON chair were sold in the United States from 1994-2015. Of those units, 4.4 million used the design shown in the trademark Registration, and another 1 million used that design, but with a differently-shaped "Posture Fit" lumbar support. Another 1.14 million were the same design as the Registration, but without any lumbar support. Herman Miller's estimated that from 2004-2015, it expended $55 million on the marketing of the AERON Chair.

Berry, the furniture historian who was identified above, testified about the significance of the AERON chair. 9/22 PM Tr., Dkt. 354 at 38-48**.** This testimony was based on Berry's knowledge of the industry, and his personal familiarity with the chair and its designers. Berry testified that they set out to design a chair with a unique appearance, and that their work involved a lengthy design process. He also opined that the AERON chair "is one of the best selling, and . . . most recognizable pieces of furniture today." *Id.* at 71. Berry also testified about his role in the process through which the Metropolitan Museum of Art selected the AERON chair to be included in its permanent collection. *Id.* 69-70.

Hieftje, Herman Miller's designer and Senior Program Director, testified that he had been employed there for 39 years, and was involved in the development and launch of the AERON chair. 9/27 AM Tr., Dkt. 363 at 37-38, 57-59. He explained that the overall shape of the chair was not based solely on functional considerations. *Id.* at 19. Thus, there were many ways to design a chair with the same functional attributes, but with different shapes. *Id.* at 64-70. He also explained that the design of the shaped backrest was not driven by any functional criteria. *Id.* at 64-65. He also testified that the AERON is "one of the top selling chairs ever." *Id.* at 66.

During cross-examination, Office Star asked Hieftje about the functional purposes of the isolated components of the AERON. Hieftje stated that other designs could provide the same functionality, and that the overall combination of those design elements served a purely aesthetic purpose. *See. id.* at 69 ("It doesn't have to look like this to perform the function you referenced."). Hieftje generally testified that "[a]ll of those elements coming together are what make the look of the AERON chair an AERON chair." *Id.* at 75-76.

Kimberly Shaw ("Shaw"), Herman Miller's Marketing Lead, testified as to marketing and public awareness of the AERON. 9/28 AM Tr., Dkt. 364 at 21. Based on her experience while working for Herman Miller and other furniture companies, she stated that "there is no other chair in the market that has come close globally" to selling as many units as the AERON chair. *Id.* at 33. She explained that the AERON chair is sold to end users in every demographic, and is well known. *Id.* She also testified that marketing materials for the AERON emphasize its aesthetic qualities, as well as the consistency of the appearance of various

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | | Date | August 1, 2017 |
|---|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | | |

models of the AERON. *Id.* at 38-45; *see also* Ex. 679-2, Dkt. 380-21 at 3 (advertising material quoting the designer of the AERON "[i]t was a matter of deliberate design to create a 'new signature shape.' . . . We designed the chair to be above all, biomorphic, . . . as a metaphor of human form"). Shaw also testified that the AERON chair has won many awards and has been placed into the permanent collections of 11 national art museums. Dkt. 364 at 46; *see also, e.g.*, Ex. 956, Dkt. 380-30 (article profiling AERON chair as an example of design); Ex. 974, Dkt. 380-31 (award to AERON designers for "Design of the Decade"). She also testified that the AERON chair has been featured in many television programs, films and other media. Dkt. 364 at 53-57. In one instance, the AERON chair received an iconic status when during an episode of "The Simpsons" God was seated on an AERON chair. Ex. 1002, Dkt. 380-35. The AERON chair was also prominent in other examples presented to the jury. *See* Ex. 983, Dkt. 380-32; Ex. 1001, Dkt. 380-34; Ex. 1336, Dkt. 380-47. The AERON chair has many followers on social media. Dkt. 364 at 57-59.

On cross-examination, Shaw was asked whether she had conducted any study or survey to confirm the popularity of the AERON chair among the general public. *Id.* at 85-87. Shaw stated that she had not, and that such a survey was unnecessary given the chair's public visibility and status. *Id.* Shaw also testified that there were many other designs for an office chair that might have the same functions as the AERON chair. *Id.* at 97-98.

Anders, an industrial design expert, testified about certain utility patents that had been obtained as to certain features of the AERON. These included the tilting mechanism and lumbar support. 9/30 AM Tr., Dkt. 366 at 26-30. Anders testified that these individual functional elements were unrelated to the overall appearance of the chair. *Id.* at 51. Anders also testified regarding Ex. 1266.2, an excerpt from his expert report that featured an assortment of office chairs with the same or similar functional characteristics of the AERON, but with different aesthetic shapes. *Id.* at 53-54. Anders identified four prominent features that are integral to the appearance of the AERON: (i) the large "bulbous" shape of the back; (ii) the overall saddle shape of the seat pan; (iii) the floating armrests; and (iv) the particular shapes of the lumbar supports. *Id.* at 48-49. He testified that there was no functional reason for any of these shapes. *Id.* at 54-58. He provided similar testimony as to the overall appearance of the AERON chair. *Id.* at 57.

On cross-examination, Anders was asked whether various components of the AERON had functional purposes. *Id.* at 64-66, 70-81. Office Star also asked whether each of the chairs in Exhibit 1266.2 had all of the same functional attributes as the AERON. Anders responded that any of the identified chairs could be engineered to have all of those functional capabilities without changing their individual appearances. *Id.* at 68.

## 2.  Testimony Regarding Office Star Practices and Products

Blumenthal testified about the AERON chair, stating that "[w]e recognize that it's been a very successful chair. . . . It's very possible that it could be the most identifiable product -- chair in the market." 9/28 PM Tr., Dkt. 356 at 16-17. Rueda stated that "[y]es, [AERON] is a popular chair." 9/29 AM Tr., Dkt. 365 at 23. Office Star's seating designer, Egger, testified that AERON is "very popular," and stated that he had personally owned one for ten years. Dkt. 366 at 23.

Office Star's internal memoranda described the AERON as "[i]conic design, most identifiable chair in the market." Ex. 1343, Dkt. 380-50 at 5. Other Officer Star documents stated that its customers were

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
| --- | --- | --- | --- |
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

demanding "Aeron style" chairs. Ex. 1173, Dkt. 380-37 at 3. Office Star employees referred to proposed chair design as an "Aeron knock off." Ex. 29, Dkt. 380-13 at 2. An email from a distributor to Office Star stated that "[r]ight now if someone is sitting in an office chair, they are either sitting in a Herman Miller Aeron chair or an Eames Chair . . . ." Ex. 1210, Dkt. 380-39 at 3. In another document, which was deemed an internal business strategy "manifesto," Office Star's President of Sales, Josh Blumenthal, wrote that "[p]eople know Herman Miller, the AERON Chair . . . etc., because it's a multi-billion-dollar company that spends thousand[s] on marketing. Every prime time television show showcases their most well-known product . . . ." 9/29/16 AM Tr., Dkt. 365 at 63.

3. <u>Adverse Inference Instruction</u>

As stated above, an adverse inference instruction was read to the jury. It also applied to the issues presented for deliberations as to the AERON chair.

**C.    Analysis**

1. <u>Whether the Unregistered Trade Dress Had Secondary Meaning</u>

The standard for determining whether a trade dress has secondary meaning is stated above. In sum, to show secondary meaning as to the AERON chair, it was not necessary to find that the general public associated it with Herman Miller, but that prospective consumers would recognize the AERON chair as associated with a single source. Once again, the jury was instructed to consider the *Sleekcraft* factors: (i) consumer perception; (ii) advertisement; (iii) demonstrated sale success; (iv) extent of use; (v) exclusivity; (vi) copying and (vii) actual confusion. Dkt. 338 at 28 (JI 26). Secondary meaning was only contested as to Herman Miller's unregistered trade dress. On this issue, Herman Miller had the burden of proof.

Herman Miller argues that whether there is secondary meaning as to the unregistered trade dress is easy to resolve, because "the unregistered trade dress looks just like the incontestable Registered Trade Dress." Dkt. 380 at 19. Herman Miller explains that three versions of AERON were sold**:**

1. Task chair with Adjustable Lumbar (football-shaped) – 4 .4 Million units
2. Task chair with PostureFit Lumbar (Y-shaped) – 1 Million units
3. Task chair with no lumbar – 1.1 Million units.

*See* Ex. 1314, Dkt. 380-43 (showing variations of design); Ex. 1330, Dkt. 380-44 (showing sales figures); Ex. 1339, Dkt. 380-49 (showing sales figures according to type of lumbar support).

Photographs show that the unregistered trade dress is very similar to the Registered Trade Dress, with different forms of lumbar support. Ex. 1314, excerpted above. Given these substantial similarities, Herman Miller argues that no reasonable jury could have concluded that the unregistered trade dress lacked secondary meaning.

Herman Miller also argues that it presented overwhelming and uncontested evidence of secondary meaning. This evidence, which is described above, includes undisputed testimony concerning the magnitude of sales, the fame of the AERON chair, marketing expenditures and awards and other

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

recognition that was received. Herman Miller also presented unrebutted evidence that Office Star intentionally copied the AERON chair. This evidence is relevant to the existence of secondary meaning. *See Fuddruckers*, 826 F.2d at 844 ("Our cases recognize that evidence of deliberate copying is relevant to a determination of secondary meaning.").

Office Star did not supply affirmative evidence responding to that presented by Herman Miller. Nor did Office Star present any expert witnesses. On this basis, Herman Miller filed a motion *in limine* to exclude any proffered evidence of other chairs in the market with appearances similar to the AERON to challenge its distinctiveness. The motion was granted. *See* Dkt. 273 at 2 (ruling on Herman Miller's Motions in Limine).

Herman Miller argues that "[w]here a litigant presents an overwhelming quantity of evidence, and its opponent effectively concedes the point with no contrary evidence – and indeed testifies *in favor* of the litigant's premise – a jury cannot have any reasonable basis to return a verdict against the litigant on that issue, especially where the burden of proof is simply a preponderance of the evidence. Dkt. 380 at 21-22.

Office Star responds that the first hurdle that Herman Miller must clear concerns whether the jury correctly found that the unregistered trade dress was nonfunctional. Office Star argues that "[Herman Miller's] burden was to show secondary meaning in a protectable, *i.e.*, non-functional trade dress." Dkt. 383 at 10. Office Star argues that unless such a determination is made, the scope of the trade dress will be undefined. Herman Miller argues that even if its motion is denied as to functionality or infringement, addressing the question of secondary meaning will narrow the scope of any possible appeal.

Office Star has not cited any case that supports the view that functionality must be decided prior to secondary meaning. The cases cited by Office Star hold that the validity of a given trade dress must be determined prior to an inquiry into infringement. *See Apple Inc. v. Samsung Elecs. Co.,* 786 F.3d 983, 991 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 429 (2016) ("it is necessary for us to determine first whether Apple's asserted trade dresses, claiming elements from its iPhone product, are nonfunctional and therefore protectable"); *Indonesian Imps., Inc. v. Old Navy, Inc.*, 1999 WL 179680, at *3 (N.D. Cal. Mar. 30, 1999) ("Without a clear statement of the claimed trade dress, the Court can neither determine whether the claimed dress is valid nor appropriately tailor any necessary injunctive relief."). Because no compelling basis has been presented to mandate the consideration of functionality prior to secondary meaning, the latter is addressed.

Office Star also argues that Herman Miller failed to present substantial evidence supporting a finding of secondary meaning, and thereby did not meet its burden of proof. Dkt. 383 at 23. Office Star argues that Herman Miller did not present "actual direct evidence showing that the public primarily signifies a protectable Aeron trade dress as source identifying." *Id.* Thus, Herman Miller did not conduct any surveys or present any testimony showing that individual members of the public recognize the AERON as linked to Herman Miller. Office Star's argument is unpersuasive. Herman Miller submitted substantial and unrebutted evidence establishing the widespread recognition and fame of the AERON chair. This evidence is summarized above. Additional survey evidence was not required to support a finding of secondary meaning.

In light of the overwhelming evidence presented supporting the presence of secondary meaning in the AERON trade dress, and the absence of any contrary evidence, the jury could not reasonably have found

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

that there was no secondary meaning as to the unregistered trade dress of the AERON chair. Therefore, Herman Miller's Motion for Judgment as a Matter of Law is **GRANTED** on this issue.

      2.    <u>Whether the Registered and Unregistered Trade Dresses Were Functional</u>

      a)    Burden of Proof for Functionality

The legal standard functionality is stated above. Because Herman Miller held a Trademark Registration in the AERON chair design, Office Star had the burden to overcome a presumption of non-functionality. Dkt. 338 at 25 (JI 24). The jury was also instructed that Herman Miller had the burden to prove by a preponderance of evidence that its unregistered trade dress was non-functional. *Id.* The jury found that both the registered and unregistered AERON trade dresses were functional. Therefore, it concluded that neither was protectable.

      b)    Whether Jury Instruction 25 Was in Error

Jury Instruction 25 included the following paragraph:

> A product feature is functional if it is essential to the product's use or purpose, or if it affects the product's cost or quality. It is non-functional if its shape or form makes no contribution to the product's function or operation. If the feature is part of the actual benefit that consumers wish to purchase when they buy the product, the feature is functional. However, if the feature serves no purpose other than as an assurance that a particular entity made, sponsored or endorsed the product, it is non-functional.

Dkt. 338 at 26.

The language to which Herman Miller objects is based on Model Ninth Circuit Jury Instruction 15.12. Herman Miller argues that this instruction is unsupported by law, and conveys the erroneous concept that if there is any functional aspect to a product, it is functional. Thus, it contends that such a construction would mean that only something that is "essentially purely sculptural" can merit trade dress protection. Dkt. 380 at 24. As stated in the prior Order on the Motion for Summary Judgment, "[t]he fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." *Clicks Billiards*, 251 F.3d at 1259 (emphasis and internal quotation marks omitted).

Herman Miller also argues that the jury instruction erred by failing to distinguish sufficiently the difference between de facto and de jure functionality. As stated in the Summary Judgment Order:

> "[D]e facto functional means that the design of a product has a function, *i.e.*, a bottle of any design holds fluid. De jure functionality, on the other hand, means that the product is in its particular shape *because it works better in this shape* . . . . [B]efore an overall product configuration can be recognized as a trademark, the entire design must be arbitrary or non de jure functional." *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

(9th Cir. 1999) (emphasis, ellipses and alteration in original).

Dkt. 192 at 16-17.

Under this analysis, finding that each component of the AERON chair is "functional" would not be sufficient to show that the AERON chair as a whole was functional. Similarly if there were a variety of possible variations of the overall shape of the AERON chair that might have had the same functionality, this would be strong evidence that the shape was not functional.

The law governing functionality, which is stated in *Clicks Billiards*, does not conflict with the language of Jury Instruction 25. Furthermore, the instruction as a whole clarified this precise issue. Thus, the paragraph quoted above was followed by a statement advising that "[t]o determine whether a product's particular shape or form is functional, you should consider whether the design as a whole is functional, that is whether the whole collection of elements making up the design or form are essential to the product's use or purpose." Dkt. 338 at 26. Jury Instruction 25 also identified factors to be considered, and consistently referred to "the Design," rather than its component parts. Jury Instruction 25 also stated and explained the *Disc Golf* factors. This provided further clarification as to the appropriate factors that are relevant in determining de jure functionality.

Herman Miller also objects to the second sentence of Instruction 25, *i.e.*, "shape or form makes no contribution to the product's function or operation." It argues that this language is unsupported by case law. It further objects to the following two sentences as relating to "older, inapplicable, and largely discredited line of cases concerning the doctrine of aesthetic functionality." Dkt. 380 at 26. These cases involve arguments in which the aesthetic look of an object performs a function. For example, pills that have a certain color in order to distinguish them from other pills. *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1068, 1070 n.6 (9th Cir. 2006) (explaining standard and citing examples). Herman Miller contends that cases concerning aesthetic functionality do not apply here, as Office Star did not attempt to demonstrate aesthetic functionality.

A review of the portions of Jury Instruction 25 that are at issue, confirms that they are consistent with Ninth Circuit authority. *See, e.g., Disc Golf*, 158 F.3d at 1007 ("A product feature need only have some utilitarian advantage to be considered functional"). The language in Instruction 25 appropriately defined "functionality." It was not necessary that further language be included to provide a distinction aesthetic and utilitarian functionality. Indeed, to have done so could well have led to confusion, without any meaningful offsetting benefit. This is confirmed by the language in Instruction 25 that identified the utilitarian factors relevant to a finding of functionality.

For these reasons, the objections to Jury Instruction 25 do not provide a basis for the requested relief.

      c)     Whether the Finding of Functionality Had Adequate Support

      (1)    Background

Herman Miller next argues that the jury lacked a reasonable basis for its finding that the AERON trade dress was functional. Herman Miller argues that the totality of the evidence presented by Office Star concerning functionality was irrelevant to the governing legal standards. Thus, this evidence did not

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

address the overall shape of the AERON, or whether that shape unfairly monopolized a set of functional advantages.

As noted above, substantial evidence was presented by Herman Miller concerning the aesthetic, non-functional purpose of the AERON chair. Herman Miller reiterates that the unregistered trade dress overlaps in appearance with the registered trade dress, and in some instances the two are nearly identical. Herman Miller argues that the presumption of non-functionality that applied to the registered trade dress gives significant weight to the argument that the unregistered trade dress is likewise non-functional. Office Star argues that relevant evidence was presented as to each of the four *Disc Golf* factors.

(2)    <u>Utilitarian Advantage</u>

Office Star presented evidence that witnesses for Herman Miller made statements that the combination of elements that made up the AERON chair were relevant to its unique functional appeal. Hieftje testified regarding the "ergonomic chair research" that went in to making the AERON chair comfortable. Dkt. 363 at 76. Similarly, Berry testified that it is "the totality of the design" that makes the AERON chair very comfortable, rather than any individual element. *Id.* at 16 (referencing "many elements" that make up the design and contribute to comfort).

Other testimony supported the finding that various elements important to the visual appearance of the AERON chair were adopted for structural reasons. Thus, Hieftje testified that the up-turned edges of the seat are used to connect it to a bracket that is attached to the tilt mechanism. *Id.* at 68. Other testimony addressed how the frame of the seat supports the mesh. *Id.* Hieftje testified that "[t]here are elements of the back rest that are providing support, which does drive its shape." *Id.* at 79. Other evidence supported a finding that the backrest was designed to provide support for a wide range of body types of those using the chair, and to allow a "wide distribution of pressure." *See* Ex. 509, Dkt. 383-3 (utility patent for AERON chair tilt control mechanism, identifying functional purposes for numerous aspects of chair); Ex. 552, Dkt. 383-7 at 6-13 (AERON Essentials" brochure, explaining features and benefits of the AERON, as well as "unique aesthetics"); Ex. 652, Dkt. 383-10 at 7 (advertising pressure distribution of the AERON, and featuring diagram of seat, back, and armrests); *Id.* at 4 (explaining the importance of designing a backrest that allows a wide distribution of pressure).

Advertising by Herman Miller also emphasized the comfort and ergonomic advantages offered by the AERON chair. For example, a brochure entitled "The Essentials: Aeron Chair," states that "[t]he Aeron chair was designed to provide a higher degree of initial and long term comfort." Ex. 552, Dkt. 380-17 at 2. It also states that "[s]mooth visual flow and curvature of the frame reflect natural, synchronized movements that intuitively conform to user movements." *Id.* at 4. *See* also Ex. 620, Dkt. 383-8 (stating that pivot mechanism in chair improves its comfort).

Office Star also introduced a series of utility patents relating to various discrete components of the AERON chair, including the tilting mechanism. Herman Miller contends that these utility patents are irrelevant to functionality, because the patents did not claim any particular overall aesthetic shape. Rather, they claim mechanical concepts for isolated elements. Functionality concerns only the overall visual appearance of an object, not its elements viewed individually.

Herman Miller contends, once again, that the evidence presented by Office Star was an attempt to

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

dissect the trade dress into isolated components, rather than address the overall appearance of the AERON chair. As Office Star's counsel stated: "So we have to actually -- we do have to dissect this chair. I mean, this chair is all about functionality." 9/22 PM Tr., Dkt. 354 at 24. Many of the individual functional elements of the AERON chair addressed by Office Star were not claimed by Herman Miller as important or identifying features of the overall trade dress. *See* 9/27 AM Tr., Dkt. 363 at 63, (identifying dominant aspects of the trade dress). These allegedly unimportant aspects of the trade dress include the mesh upholstery, which Herman Miller argued was unimportant to the aesthetic appearance of the chair, and the mechanical tilting mechanism. *Id.* at 74; *see also* 9/30 PM Tr., Dkt. 358 at 7-8 (stating mesh was not distinctive); 9/30 AM Tr., Dkt. 366 at 76 (tilting mechanism not distinctive). Herman Miller contends that this evidence concerning individual components of the AERON chair in isolation was irrelevant, and could not reasonably have formed a basis for the Jury's verdict that the design of the chair as a whole was functional.

Notwithstanding the position advanced by Herman Miller, the attributes of the components are relevant to assessing the functionality of the AERON design as a whole. Office Star presented evidence pertaining to virtually every element of the AERON trade dress. The jury could reasonably have relied on this evidence in determining that the combination of these elements served a unique functional purpose, which could not otherwise be provided. *See Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002) ("[w]here the plaintiff only offers evidence that the whole is nothing other than the assemblage of functional parts . . . it is semantic trickery to say that there is still some sort of separate overall appearance which is non-functional" (internal quotation marks omitted)).

### (3) Advertising

Herman Miller presented substantial evidence of advertisements highlighting the aesthetic qualities of the AERON. It is discussed above. However, Office Star presented advertisements and brochures that addressed the comfort and ergonomic benefits of the AERON chair. They included some that discussed the AERON chair as a whole. *See, e.g.*, Exs. 521, 524, 525, 552, 620, 629, 652 at 70-92, 682, 683. This evidence supports the jury's finding that the design of the chair was functional. *See Apple*, 786 F.3d at 993 ("If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality.").

### (4) Availability of Alternative Designs

The purpose of this analysis is to ensure that one entity is not given the exclusive right to a design when "free competition would be unduly hindered by according the design trademark protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992). Thus, *Apple* found that a design for a smartphone device -- a rectangular display screen with rounded corners -- was functional. 786 F.3d at 993. The Federal Circuit explained that "[a] manufacturer does not have rights under trade dress law to compel its competitors to resort to alternative designs which have a different set of advantages and disadvantages." *Id.* (internal quotation marks omitted). It also stated that the failure of the plaintiff to present actual samples of alternative designs with the same functional features weighed heavily in favor of a finding that the design was functional. Similarly, in *Leatherman*, 199 F.3d 1009, the Ninth Circuit found that the design of a pocket tool was not protectable, because there are only a limited number of ways that the component tools could be assembled into a unit.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Herman Miller presented witnesses, including Anders, who testified that alternative designs were possible. Evidence that alternative designs of similar utility were available also included that the designers of the AERON chair created numerous prototypes in the course of its design, many of which had similar functionality. *See* Ex. 652, Dkt. 380-18 at 35-39 (affidavits of AERON chair designers). Anders presented images of other task chairs that do not resemble the AERON chair. Furthermore, Herman Miller argues that *Apple* and *Leatherman* do not apply, because unlike the products at issue in those cases, the AERON chair constitutes a complex assembly of functional components that could be presented in many variations.

A review of the relevant evidence shows that a jury could reasonably have found that the proposed alternative designs did not offer the same utilitarian benefits that are provided by the AERON chair. Specifically, many of the proposed designs did not feature mesh seating and backing, which contribute to both the appearance and functionality of the AERON chair. Dkt. 383 at 21. Office Star argues that none of the chairs presented had exactly the same functional features as the AERON, and that no alternative chair was possible that did not closely follow its distinctive appearance. Testimony developed through the cross-examination of Herman Miller witnesses also showed the functional attributes of the individual components of the AERON, and the functional importance of their assembly as a completed product. The existence of ERON prototypes does not change this analysis. *See Apple*, 786 F.3d at 992 (the plaintiff "catalog[ed] the mere existence of other design possibilities embodied in rejected iPhone prototypes and other manufacturers' smartphones" rather than identifying actual distinct products on the market).

For these reasons, the jury could reasonably have concluded that the availability of alternative designs weighs in favor of a finding of functionality.

(5)     Whether Design Results from Comparatively Simple or Inexpensive Method of Manufacture

Neither Office Star nor Herman Miller presented substantial evidence as to this factor. Therefore, it is not considered in the analysis.

\*               \*               \*

In light of the foregoing, sufficient evidence was presented at trial for the jury reasonably to conclude that the registered and unregistered AERON trade dresses were functional, and therefore not subject to protection. Therefore, Herman Miller's Motion for Judgment as a Matter of Law is **DENIED** as to functionality.

3.     Whether Office Star Improperly Relied on Documents and Testimony Not In Evidence During Closing

Herman Miller argues that in closing argument Office Star's counsel referred to two exhibits for which there was insufficient support. On this basis, Herman Miller argues that that a new trial or judgment as a matter of law should be granted.

Office Star's closing argument included a reference to the testimony of Josh Blumenthal. 10/5 PM Tr., Dkt. 360 at 11-12. Counsel for Office Star stated: "Josh Blumenthal testified that, as a backrest of Office

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Star's chairs gets wider, the flex increases -- that would certainly apply to the Aeron chair -- and increased flexion improves comfort." *Id.* at 11. The argument also included a reference to Ex. 552 (Dkt. 383-7), a Herman Miller brochure. Counsel for Office Star read from that brochure, which stated, *inter alia*, that "[a]ll backrests on Aeron chairs are generously sized to accommodate a wide range of shoulder widths and to help transfer weight from the seat to the back." Dkt. 360 at 12. Upon reading this passage, counsel for Office Star stated: "So the fact that the backrest is designed to accommodate multiple size people with wider back and less wide backs, demonstrates that the wider top region of the Aeron chair is functional." *Id.*

Herman Miller notes that the testimony of Josh Blumenthal about the shape and flexibility of the back was not admitted into evidence. He lacked expert knowledge regarding the design of the AERON chair. *See* 9/29 PM Tr., Dkt. 357 at 8-12. There was no supporting testimony at trial as to Ex. 552, although it was admitted.

In closing argument Office Star's counsel also referred to Ex. 507 (Dkt. 380-14, 380-15), a "product specifications manual" related to the "Echo" chair – an earlier iteration of the AERON. This exhibit was not admitted into evidence. Nonetheless, Office Star's counsel stated, while reading from the exhibit:

> "The arms for optimum adjustment and positioning throughout the tilt cycle in the same trajectory of the backrest are cantilevered acutely from the chair frame. It is to be expected that, while they must be stable whilst keyboarding, they can bend slightly under greater pressure and need not be as rigid as those on [other chairs]."
>
> . . .
>
> "Echo's arms are unconventional and designed to support the arms while working on keyboards. In this mode, the armrest must provide stable, wobble-free support. In addition, the generous size of the armrests presupposes they will be used heavily to support upper body weight."

Dkt. 360 at 14-15. He then stated:

> These are all functions of the armrest, pretty self-evident, but this is what Herman Miller's own documents talk about. And it's a definition of functionality or non-functionality that carries through to almost every issue that you are going to have to decide.

*Id.* at 15.

Herman Miller argues that these statements were unsupported, and were highly prejudicial and misleading. In particular, it objects to the conclusion that the backrest had a functional purpose. Herman Miller notes that Ex. 507, which was quoted, was excluded. It also argues that Ex. 552, which was quoted in the closing argument, did not support the conclusion that the overall shape of the back rest was functional, as it only states that the AERON backrests were "generously proportioned," but did not further state that these proportions were functional. Therefore, Herman Miller argues that this conclusion must have been based on the excluded testimony of Josh Blumenthal, and the excluded Ex. 507. Furthermore, Herman Miller notes that the final decision about admissibility of exhibits was made shortly before closing

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

arguments. *See* 10/5 AM Transcript, Dkt 368. Therefore, it argues that it was unable to confirm contemporaneously that Exhibit 507 was not in evidence, and could not raise an objection to its use.

Office Star argues that Herman Miller has not shown that plain error took place in allowing the challenged statements. Office Star argues that there was substantial evidence at trial that supported the jury's finding of functionality. The Ninth Circuit has "held that where 'offending remarks occurred principally during opening statement and closing argument, rather than throughout the course of the trial,' [it is] less inclined to find the statements pervaded the trial and thus prejudiced the jury." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 518 (9th Cir. 2004) (*quoting Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984)).

Furthermore, Office Star argues that the statements cited were unlikely to prejudice the jury, because they were substantially similar evidence that was admitted. Office Star notes that some testimony by Josh Blumenthal regarding the features of the backrest was admitted at trial, on the basis of his knowledge of the features of the Herman Miller and Office Star chairs. *See* Dkt. 357 at 13 ("[Y]ou apply pressure to the lower lumbar region where it's narrower and you get one amount of resistance. You apply the same amount of pressure to the upper portion and you get a different amount of resistance."). Although there was no testimony relating to Ex. 552, Office Star notes that the document was admitted into evidence, and could properly been considered by the jury. Finally, with regard to Ex. 507, Office Star argues that the contents of the document that counsel relied upon were in accord with statements admitted into evidence, including the functional attributes of the backrest identified in Ex. 552.

An assessment of the foregoing, the failure of Herman Miller to make a timely objection as to to certain matters, and substantial evidence supporting a finding of functionality, demonstrates that Herman Miller has not shown that the closing argument of counsel for Office Star was sufficiently prejudicial or misleading to warrant a new trial. Therefore, the request by Herman Miller for a new trial on this ground is **DENIED**.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

4.    Whether the Court has Subject Matter Jurisdiction to Invalidate the PostureFit Version of the Trade Dress

There were two versions of the AERON Trade Dress at issue in this case: the Adjustable Lumbar version (with oval-shaped lumbar) and the PostureFit version (with Y-shaped lumbar). *See* Ex.1314, Dkt. 384-43. The PostureFit version is as follows:



Dkt. 380 at 35.

Herman Miller's counsel, Jean-Paul Ciardullo ("Ciardullo"), declares that prior to trial, on September 18, 2016, Herman Miller withdrew all claims of infringement as to a series of previously-accused Office Star chairs. They had Y-shaped lumbar supports, which bore a resemblance to the PostureFit version of the AERON chair. Ciardullo Decl., Dkt. 380-1 ¶ 2. Furthermore, Herman Miller made clear that the PostureFit was no longer in controversy. *See* 9/27 AM Tr., Dkt. 363 at 83 (Hieftje testifying that it is his understanding that the PostureFit version is "no longer part of the case"); *see also* 9/28 AM Tr., Dkt. 364 at 87-88 (discussing withdrawal of infringement claims as to certain chairs).

Herman Miller argues that the only version of the AERON trade dress asserted at trial was the Adjustable Lumbar version. Herman Miller argues that the PostureFit version of the AERON chair is not subject to invalidation, as there is no subject matter jurisdiction to enter judgment on a matter not in controversy. *See Alcon Research Ltd. v. Barr Labs. Inc.*, 745 F.3d 1180, 1193 (Fed. Cir. 2014) ("[A] patentee's announcement that it was no longer pursuing particular claims, coupled with its ceasing to litigate them was sufficient to remove those claims from the case.").

Office Star argues that judgment is appropriate as to both the Adjustable Lumbar and PostureFit versions of the AERON chair. Office Star notes that Herman Miller's trial evidence included evidence related to the PostureFit model. Some of this evidence is cited by Herman Miller in support of its claim that the AERON chair has secondary meaning. *See, e.g.*, Ex. 1002, Dkt. 380-35 (depicting scenes of a television show with PostureFit version of Aeron chair). At trial, Herman Miller also relied on sales and marketing figures for the PostureFit version in order to establish the fame and recognition of the Aeron chair.

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Herman Miller's partial reliance on evidence related to the PostureFit version during the trial did not leave its trade dress in controversy once the claim was withdrawn. Therefore, Herman Miller's Motion for Judgment as a Matter of Law regarding the validity of the PostureFit version of the AERON trade dress is **GRANTED**.

### D. Conclusion

For the foregoing reasons, Herman Miller's Motion for Judgment as a Matter of Law **GRANTED IN PART** as to the existence of secondary meaning in the AERON chair and the question of jurisdiction over the PostureFit version, and **DENIED IN PART** as to all other relief sought.

## V. Herman Miller's Motion for Entry of Final Judgment and Permanent Injunction With Respect to the EAMES Trade Dress (Dkt. 379)

### A. Introduction

Following trial, the jury returned a verdict (Dkt. 344) that both Herman Miller's registered and unregistered EAMES trade dress had been willfully infringed, and that Herman Miller suffered $3.3 million in infringement damages. This amount of damages was based on the amount of Office Star's profits from sale of the infringing chairs, which were entered as a proxy for Herman Miller's injury. *See* Dkt. 338 at 38 (JI 33A). This use of profits as a proxy for injury was testified to by Herman Miller's damages expert Suzanne Heinemann ("Heinemann"). 10/4 AM Tr., Dkt. 364 at 15; *See also* Ex. 1342, Dkt. 384-49 (showing Office Star's net profits and sales). The jury further awarded Herman Miller dilution damages of $5.1 million. *See* Dkt. 344.

In accordance with the verdict, Herman Miller seeks entry of Final Judgment and a Permanent Injunction on the following terms:

1. $8.4 million in damages;
2. An accounting for any infringing sales not included in the verdict;
3. Prejudgment interest of $332,411;
4. Post-judgment interest according to 28 U.S.C. § 1961;
5. An injunction against further infringement in the United States; and
6. An injunction against further sales activities in foreign countries that cause injury to Herman Miller in the United States.

Dkt. 379 at 6.

Herman Miller requests prejudgment interest calculated by using the monthly sales revenues of the Accused Chairs based on the amount awarded by the jury, and spread over the time that the infringing chairs were first sold in January 2011 until the trial in August 2016. Connolly Decl., 379-25 ¶¶ 8-9. Using the prime rate, interest was then calculated monthly and compounded annually.

Office Star argues that prejudgment interest is not available as a matter of law. The Lanham Act expressly provides for prejudgment interest in cases of counterfeit marks. 15 U.S.C. § 1117(b). This action arises under § 1117(a). *See Neurovision Med. Prods., Inc.* v. *Nuvasive, Inc.*, No.CV 09-6988 DSK

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|-------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

(JEMx), 2014 WL 12567167, at *2 (C.D. Cal. Dec. 2, 2014) ("[T]here is ample reason to believe that Congress explicitly did *not* intend for prejudgment interest to be awarded under § 1117(a) because it provided prejudgment interest as an additional remedy . . . for the use of a counterfeit mark in the very next subsection of the statute.").

Herman Miller notes that prejudgment interest has been applied in cases of willful trademark infringement. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (prejudgment interest in a trademark infringement case is particularly appropriate when infringement is intentional and outrageous); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000) (reversing denial of prejudgment interest in trademark infringement claim). However, these cases did not address the distinction between §§ 1117(a) and 1117(b). "At best, they stand for a general disposition in favor of prejudgment interest – especially in 'exceptional' cases." *Neurovision Med. Prods.*, 2014 WL 12567167, at *2.

Because the statute does not provide for such an award, and it has not been shown that this is an exceptional case, Herman Miller's request for prejudgment interest is **DENIED**.

### A. Post-Judgment Interest

Herman Miller also requests post-judgment interest pursuant to 28 U.S.C. § 1961. "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." *Id.*

Herman Miller's request is **GRANTED**. This interest shall apply from the date of judgment. Should Herman Miller elect to accept the remittitur, post-judgment interest will be based on the corresponding amount of damages. If a new trial on damages proceeds, interest will be based on the amount, if any, determined at trial.

### B. Permanent Injunction

#### 1. Requested Relief

Herman Miller seeks an injunction that would bar Office Star from selling the Accused Chairs. Its proposed language is as follows:

(1) Office Star is permanently enjoined from selling, marketing, advertising, promoting, shipping, transferring, distributing – or otherwise inducing or contributing to the foregoing activities – anywhere in the world, any of the following model numbers of chairs identified in the Jury Verdict, or any colorable imitations thereof:

73631, 73633, 73632, 73638, 73639, 74613LT, 74123LT, 74612LT, 74618LT, 73129LT, 74603LT, 74023LT, 74602LT, 74608LT, 73029LT, 74653, 74523, 74652, 74658, 73529, 73603, 73023, 74023, 74123, 74603, 74613, 7360M, 7361M, 7360MLT, 7361MLT, 78603LT, 78023LT, EC39890C-EC3, EC39891C-EC3, EC39895C-EC3.

| Case No. | ED CV14-01926 JAK (SPx) | | Date | August 1, 2017 |
|----------|--------------------------|--|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | | |

(2) Office Star is permanently enjoined from selling, marketing, advertising, promoting, shipping, transferring, distributing – or otherwise inducing or contributing to the foregoing activities – anywhere in the world, any chair that is a copy or colorable imitation of any Herman Miller EAMES Aluminum Group chair, images of which are appended hereto from Trial Exhibit 1314, or other chair products so similar to the EAMES chair designs as to be likely to cause confusion, to cause mistake or to deceive or to dilute the distinctive quality of the EAMES chair designs.

(3) Office Star is permanently enjoined from contesting the validity of Herman Miller's trade dress rights in the EAMES Aluminum Group designs in any court or agency proceeding, or from assisting any other entity to do so.

(4) Consistent with Fed. R. Civ. P. 65(d), this Injunction shall extend to Office Star's officers, agents and servants, and all other persons in active concert or participation with Office Star with actual notice of this Injunction. For avoidance of doubt, Office Star['s] manufacturer of the infringing chairs – King Hong Industrial Co., Ltd. – shall be deemed in active concert with Office Star, as will Office Star's dealers and distributors of the infringing chairs.

(5) This Injunction shall not apply to any conduct that is expressly authorized by Herman Miller.

(6) The Court shall retain jurisdiction to administer the Injunction and ensure compliance therewith, whether by contempt proceedings or as otherwise necessary.

2.    Legal Standards

The Lanham Act provides that a court may issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . ." 15 U.S.C. § 1116(a).

A plaintiff seeking a permanent injunction must demonstrate

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

3. <u>Application</u>

a) Whether Injunctive Relief is Warranted

The evidence presented at trial demonstrated that Office Star has sold substantial units of infringing products. More than 75,000 units have been sold since 2010. Ex. 801, Dkt. 379-11. These sales generated total revenues of approximately $11.5 Million. *Id.* Beyond financial harm, Herman Miller contends that it has suffered, and will continue to suffer irreparable harm, through lost goodwill and damage to its reputation if the sales continue. "Harm to goodwill and loss of the ability to control a party's reputation based on an inability to control the infringer's products are irreparable harms" and "distribution of [] a great number of counterfeit goods — particularly goods of inferior quality — risks harming the goodwill and value of Plaintiffs' trademark and constitutes irreparable harm." *Burberry Ltd. UK v. Cohen*, No.LA CV 12-02384 JAK (PLAx), 2013 WL 12113995, *2 (C.D. Cal. 2013) (Kronstadt, J.) (granting permanent injunction in trademark case). *See also Razor USA LLC v. Vizio, Inc.*, No.:CV 14-01586 SJO (JCGx), 2015 WL 12656941, at *9 (C.D. Cal. Oct. 19, 2015) ("dilution of a famous mark itself can constitute an irreparable injury").

The jury found that Herman Miller's trade dress has been diluted. Herman Miller states that it does not license the EAMES trade dress, and maintains strict control over their production to ensure high quality construction and maintenance of a consistent distinctive look. *See* Dkt. 355 at 53 (testimony of Bond regarding production process); 77 (describing measures taken for quality control). If Office Star continued making the infringing chairs, Herman Miller would lose its ability to control the trade dress in the market, resulting in irreparable injury to the brand from lower quality copies and erosion of the distinctive appearance of its design.

The balancing of the hardships also favors injunctive relief. Office Star has no legitimate interest in engaging in unlawful conduct in violation of the Lanham Act.

Finally, the public interest favors injunctive relief. There is an interest in the enforcement of the trademark laws, barring willful infringement and protecting against consumer confusion.

In light of the foregoing factors, injunctive relief is warranted here.

b) Scope of Relief

Office Star argues that the proposed injunction is vague and ambiguous, and fails to identify what specific acts are forbidden in a manner that would allow enforcement by a court. Dkt. 383 at 28. "If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006) (quoting *Gates v. Shinn*, 98 F.3d 463, 468 (9th1996)). Specifically, Office Star objects to Herman Miller's proposal that the injunction extend to sale of "any colorable imitations" of the accused chairs. Office Star argues that, at a minimum, the injunction must specify what protectable elements of the trade dress are included within the enjoined conduct. Office Star cites *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) ("focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress").

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. |

Herman Miller argues that extending the injunction to "colorable imitations" of the EAMES trade dress is both unambiguous and necessary to prevent Office Star from avoiding the injunction by making minor changes to its infringing chairs. Herman Miller cites *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320 (9th Cir. 1997). There, the court addressed similar concerns:

> When enforcing injunctions that enjoin use of any mark confusingly similar to the protected mark, courts should . . . simply evaluate whether or not the new mark is confusingly similar to the protected mark. . . . This conclusion is consistent with the rule that an infringer must keep a fair distance from the 'margin line.'. . . [A trademark infringer] should have its conduct carefully scrutinized in future use and should not be allowed to claim the same leniency accorded a good faith user who starts use of the mark which the enjoined defendant has shifted to. Otherwise, the enjoined defendant could simply make a tiny change and start a new trademark contest all over again in the context of the contempt hearing as to the use of the 'new' format.

*Id.* at 1322-23 (internal quotation marks omitted). The court found that any "colorable imitations" of the trademark in question were subject to the injunction.

The language of the injunction is reasonably tailored to prevent such infringement, and does not unreasonably limit Office Star from developing and selling non-infringing products. Therefore, the scope of the proposed judgment is appropriate.

### 4.   Injunction of Extraterritorial Sales

Herman Miller also seeks to enjoin sales in foreign markets. Herman Miller states that Office Star sells its products through distributors, who may resell them throughout the world. Herman Miller contends that the chairs are also sold online by retailers. In support of granting such an injunction under the Lanham Act, Herman Miller cites *Reebok Int'l, Ltd. v. Marnatech Enters.*, 970 F.2d 552, 554-555 (9th Cir. 1992). There, the Ninth Circuit upheld an injunction prohibiting sale of counterfeit shoes in Mexico, upon finding that "sales of counterfeit REEBOK shoes decreased the sale of genuine REEBOK shoes in Mexico and the United States and directly decreased the value of Reebok's consolidated holdings." The Ninth Circuit considered three factors:

> first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority.

*Id.* (citing *Timberlane Lumber Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 549 F.2d 597 (9th Cir.1976)).

As to the first of these factors, Herman Miller argues that Office Star's international sales have a significant effect on American foreign commerce. Herman Miller is based in Grand Rapids, Michigan, where it manufactures the EAMES Chairs. 9/27 AM Tr., Dkt. 363 at 48-49. Hogan, the Director of Global Business Financial Systems, declares that Herman Miller exports a large amount of EAMES chairs. *See* Hogan Decl., Dkt. 379-23. Exhibit A to his declaration states the number of such sales in recent years. Dkt. 379-24. It also reflects that between 2000 and 2016, Herman Miller sold almost 100,000 EAMES

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

Aluminum Group chairs overseas, which generated approximately $88 million in revenues. *Id.* Almost half these sales were in Canada. *Id.* This evidence supports the claim that the risk of lost sales and trade dress dilution is present through sales in foreign markets, and would have an effect in the United States.

As to the second factor, Herman Miller argues that the harm from lost foreign sales is sufficiently large and cognizable to warrant the requested relief. For the same reasons stated above, this weighs in favor of the requested injunction as to Office Star sales in Canada. That is the foreign market in which Herman Miller has the greatest presence. Exhibit A to the Hogan Declaration reflects that, from 2000 to 2016, a total of 51,432 EAMES Aluminum Group units were sold in Canada, compared to 6,284 sales in Australia, the foreign country with the second highest amount of sales. *Id.* Office Star argues that extending the injunction to "the entire world" is overbroad, as there are many countries in which Herman Miller conducts little to no business. Office star adds that injunctive relief must be narrowly tailored to address the claimed harms. Office Star also argues that a global injunction would unnecessarily interfere with the laws of other nations, including jurisdictions in which Herman Miller attempted and failed to obtain registered trademarks for the EAMES design. Office Star's counsel has submitted a declaration identifying Malaysia and Argentina as examples.

As to the relative interests of American foreign commerce and those of other nations, *Reebok* stated its assessment should be based on a balancing of the following seven factors:

> [T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Reebok Int'l,* 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614).

Herman Miller has not shown that infringement in other jurisdictions threatens to cause additional domestic infringement. There is no evidence that counterfeit goods are being imported. Nor has Herman Miller provided any evidence regarding the law enforcement interests of other nations. Herman Miller does not have registered trade dress rights to the EAMES chair in certain foreign countries. These factors weigh against granting an injunction here.

Although an injunction on domestic production and sale of the infringing chairs is appropriate under the Lanham Act, Herman Miller has not sufficiently shown that the interests of American foreign commerce are sufficiently strong to warrant injunctive relief as to all foreign activities. However, Herman Miller's strong business interests in Canada weigh in favor of an injunction extending to there. Therefore, an extraterritorial injunction is **GRANTED IN PART**, as to Canada only.

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|----------|--------------------------|------|----------------|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

5. <u>Other Factors Related to the Scope of Injunctive Relief</u>

a) Injunction on Related Parties

Herman Miller argues that pursuant to Fed. R. Civ. P. 65(d), the injunction should apply to all Office Star employees, agents and entities acting in concert or participation with Office Star. Herman Miller requests that this include Office Star's distributors of the infringing chairs, and also the manufacturer, King Hong Industrial No., Ltd. ("King Hong"), which was identified at trial. 9/28 PM Tr., Dkt. 356 at 41.

Office Star argues that such an injunction would be in violation of the "long observed [] general rule that a court may not enter an injunction against a person who has not been made a party to the case before it." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996). Office Star acknowledges that individuals who act in concert with an enjoined party to violate an injunction may be held in contempt. *See id.* at 1395. However, it argues that no grounds have been shown to treat King Hong or other entities as acting in active concert prior to the issuance of a judgment. Office Star adds that such an injunction would be redundant, because Rule 65(d)(2)(C) binds non-parties who receive actual notice of the injunction and "are in active concert or participation" with the enjoined.

Because inclusion of non-parties in the injunction is redundant, and potentially prejudicial to entities who were not parties to this case, the request for this proposed relief is **DENIED**.

b) Injunction on Challenging EAMES Trade Dress

Office Star also challenges the proposed language that would permanently enjoin it from contesting the validity of the "trade dress rights in the Eames Aluminum Group designs." Dkt. 383 at 33. Office Star argues that this language could be read to enjoin any appeal of the present judgment, which would be improper and contrary to its legal rights. Although this interpretation of the scope of the language is not persuasive, this language is unnecessary. Office Star is prevented from re-litigating the issues in this case by the doctrine of res judicata.

**C. Whether Post-Judgment Damages Should Be Awarded**

The Lanham Act permits a prevailing party to request an accounting of a defendant's profits from willful infringement on a protected trademark or protected trade dress. It states that in cases of willful infringement,

> the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

In cases of willful infringement, an accounting is generally warranted. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993), *superseded by statute on other grounds*, Trademark Amendments Act of 1999, Pub. L. No. 106–43, 113 Stat. 218; *see also Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982) ("[A]n award of little more than nominal damages would encourage a counterfeiter to merely switch from one infringing scheme to another as soon as the infringed owner became aware of the fabrication. Such a method of enforcement would fail to serve as a convincing deterrent to the profit maximizing entrepreneur who engages in trademark piracy."). Furthermore, such an accounting supports the Lanham Act's purpose of preventing unjust enrichment from acts of willful infringement. *See Maier Brewing Co. v. Fleischmann Distilling Co.*, 390 F.2d 117, 123 (9th Cir. 1968). District courts are granted broad discretion to fashion remedies for violations of trademark law. *See id.* at 121.

An accounting of profits under Section 1117(a) is a form of equitable relief. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 410 (2015). Therefore, such an accounting may properly be ordered following the return of a jury verdict without violating a party's right to a jury trial. *See id.*

Herman Miller requests that an accounting of all sales of the infringing products since the September 9, 2016 judgment, and that any profits from such sales be disgorged by Office Star. Herman Miller proposes that this assessment may be made according using the methodology of Heinemann. Herman Miller notes that the determinations of profit made by Heinemann and presented at trial were consistent with the jury's verdict. *See* Ex 801, Dkt. 384-25 (stating profits of Office Star); Ex. 1342, Dkt. 384-49 (damages calculations by Heinemann).

Office Star has not opposed this request. Furthermore, as noted above, the jury's finding of willfulness in infringing on the EAMES trade dress was reasonable. Therefore, disgorgement of profits from the time of the verdict is appropriate here, and is **GRANTED**; provided, however, this is without prejudice to the right of Office Star to contest the reliability and accuracy of the amount claimed. The Court retains jurisdiction to address such issues through timely filed motions.

## VI.    Conclusions

For the foregoing reasons, Office Star's Motion for Judgment as a Matter of Law as to damages is **GRANTED IN PART**, as to remittitur for dilution damages, and **DENIED IN PART** as to all other requests. Office Star's remaining Motions for Judgment as a Matter of Law are **DENIED**. Herman Miller's Motion for Judgment as a Matter of Law is **GRANTED IN PART**. Herman Miller's Motion for Judgment and Permanent Injunction is **GRANTED IN PART**. On or before August 8, 2017, Herman Miller shall file a statement as to whether it will accept the remitter or request a new trial as to dilution damages.

On or before August 15, 2017, counsel shall meet and confer to seek to reach an agreement on a

**CIVIL MINUTES – GENERAL**

| Case No. | ED CV14-01926 JAK (SPx) | Date | August 1, 2017 |
|---|---|---|---|
| Title | Blumenthal Distributing, Inc. d/b/a Office Star, et al. v. Herman Miller, Inc. | | |

proposed judgment for entry in this matter. If no such agreement can be reached, within that same time period, Herman Miller shall lodge a proposed judgment, to attach a proposed injunction in keeping with the requirements set out above. Office Star may file any objections to these filings in accordance with the Local Rules no later than August 22, 2017.


**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer          ak